1  NINA LOCKER, State Bar No. 123838
   CATHERINE E. MORENO, State Bar No. 264517
2  BENJAMIN M. CROSSON, State Bar No. 247560
   WILSON SONSINI GOODRICH & ROSATI
3  Professional Corporation
   650 Page Mill Road
4  Palo Alto, CA 94304-1050
   Telephone: (650) 493-9300
5  Facsimile: (650) 565-5100
   Email: nlocker@wsgr.com
6  Email: cmoreno@wsgr.com
   Email: bcrosson@wsgr.com
7
   Attorneys for Defendants
8  Pacific Biosciences of California, Inc., Hugh C.
   Martin, Susan K. Barnes, Brian B. Dow, Brook
9  Byers, William W. Ericson, Michael
   Hunkapiller, Randall S. Livingston, Susan
10 Siegel, and David B. Singer

ORIGINAL
F I L E D

NOV 2 3 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

EJD

11

12             IN THE UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14
   GREG YOUNG, Individually and on Behalf of     CV 11 CASE NO.: 5668
15 All Others Similarly Situated,

16                    Plaintiff,                  NOTICE OF REMOVAL

17        v.

18 PACIFIC BIOSCIENCES OF CALIFORNIA,
   INC., HUGH C. MARTIN, SUSAN K.
19 BARNES, BRIAN B. DOW, BROOK BYERS,
   WILLIAM W. ERICSON, MICHAEL
20 HUNKAPILLER, RANDALL S. LIVINGSTON,
   SUSAN SIEGEL, DAVID B. SINGER, J.P.
21 MORGAN SECURITIES LLC, MORGAN
   STANLEY & CO., INC., DEUTSCHE BANK
22 SECURITIES INC. and PIPER JAFFRAY &
   CO.,
23
                      Defendants.
24

25

26

27

28

1  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2  DISTRICT OF CALIFORNIA:

3      PLEASE TAKE NOTICE that defendants Pacific Biosciences of California, Inc.

4  ("PacBio"), Hugh C. Martin, Susan K. Barnes, Brian B. Dow, Brook Byers, William W. Ericson,

5  Michael Hunkapiller, Randall S. Livingston, Susan Siegel and David B. Singer (collectively, the

6  "PacBio Defendants") hereby remove to this Court the state court action described below:

7  **Basis for Removal Jurisdiction**

8      1.    On October 21, 2011, an action was commended in Superior Court of the State of

9  California, County of San Mateo, captioned *Greg Young v. Pacific Biosciences of California,*

10  *Inc., et al.*, Case No. CIV 509210. A copy of the Complaint is attached as Exhibit A.

11      2.    On October 27, 2011, a process server delivered several copies of the Complaint

12  to Gina Guerrieri, a paralegal at PacBio. The PacBio Defendants do not concede that service

13  was validly effected by this delivery.

14      3.    On November 17, 2011, each of the PacBio Defendants, by and through their

15  counsel, signed and returned to Plaintiff a Notice and Acknowledgment of Receipt of the

16  Complaint. Copies of these forms are attached as Exhibits B through K.

17      4.    This action is removable under 28 U.S.C. § 1441(a) and (b) and the Securities

18  Litigation Uniform Standards Act of 1988 ("SLUSA"), Pub. L. No., 105-353, 112 Stat. 3227

19  (1998).

20      5.    Section 1441(a) provides that "[e]xcept as otherwise expressly provided by Act of

21  Congress, any civil action brought in a State court of which the district courts of the United

22  States have original jurisdiction, may be removed by the defendant or the defendants, to the

23  district court of the United States for the district and division embracing the place where such

24  action is pending." Section 1441(b) provides that "[a]ny civil action of which the district courts

25  have original jurisdiction founded on a claim or right arising under the Constitution, treaties or

26  laws of the United States shall be removable without regard to the citizenship or residence of the

27  parties."

28

NOTICE OF REMOVAL         -1-

1      6.     This action is a civil action of which this Court has original jurisdiction under the

2   Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77v(a) and 77p(c), because it purports to

3   assert federal claims arising under the Securities Act.  Specifically, Plaintiff asserts claims under

4   Sections 11, 12(a)(2), and 15 of the Securities Act.  15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

5   Subsection (a) of 15 U.S.C. § 77v establishes that: "The district courts of the United States and

6   the United States courts of any Territory shall have jurisdiction of offenses and violations under

7   this subchapter and under the rules and regulations promulgated by the Commission in respect

8   thereto, and, concurrent with State and Territorial courts, except as provided in section 77p of

9   this title with respect to covered class actions, of all suits in equity and actions at law brought to

10   enforce any liability or duty created by this subchapter."

11      7.     Section 77v(a) also dictates the certain actions may not be removed, establishing

12   that "[e]xcept as provided in section 77p(c) of this title, no case arising under this subchapter and

13   brought in any State court of competent jurisdiction shall be removed to any court of the United

14   States." (emphasis added).  Section 77p(c), however, creates an exception to the Securities Act's

15   non-removal provision, providing that "[a]ny covered class action brought in any State court

16   involving a covered security, as set forth in subsection (b), shall be removable to the Federal

17   district court for the district in which the action is pending, and shall be subject to subsection

18   (b)."

19      8.     A "covered class action" is defined as: "any single lawsuit in which . . . one or

20   more named parties seek to recover damages on a representative basis on behalf of themselves

21   and other unnamed parties similarly situated, and questions of law or fact common to those

22   persons or members of the prospective class predominate over any questions affecting only

23   individual persons or members. . . " 15 U.S.C. § 77p(f)(2)(A)(II).  A "covered security" is

24   defined to include any security "listed, or authorized for listing, on the National Market System

25   of the NASDAQ Stock market . . . ." 15 U.S.C. §§ 77r(b)(1); 77p(f)(3).

26      9.     This action is a covered class action involving a covered security.  Here, Plaintiff

27   seeks damages on a representative basis on behalf of himself and a class of other unnamed,

28   similarly situated parties (Compl. ¶ 96), and the Complaint alleges that "[c]ommon questions of

1    law and fact exist as to all members of the Class and predominate over any questions solely

2    affecting individual members of the Class," (Compl. ¶ 100) which are related to securities that

3    were publicly offered and are listed on the NASDAQ. (Compl. ¶ 18). Accordingly, this action is

4    properly removable to this Court pursuant to 28 U.S.C. § 1441(a) and 15 U.S.C. §§ 77p(c) and

5    77v(a).

6    **Procedural Requirements**

7        10.    Removal is timely pursuant to 28 U.S.C. § 1446(b) because this Notice of

8    Removal was filed within thirty days of the receipt by any of the defendants of a copy of the

9    October 21, 2011 Complaint.

10        11.    The PacBio Defendants are authorized to state that all named defendants concur

11    in, and consent to, the removal of this action to this Court, subject to and without waiving any

12    defenses and rights available to them.

13        12.    Pursuant to 28 U.S.C. § 1446(d), the PacBio Defendants will promptly serve a

14    copy of this Notice on counsel for Plaintiff and will file a copy of this Notice with the Clerk of

15    the Superior Court of the State of California, County of San Mateo.

16

17    Dated: November 23, 2011                    Respectfully submitted,

18                                                WILSON SONSINI GOODRICH & ROSATI
                                                  Professional Corporation
19

20

21                                               By: Nina Locker /BC
                                                     Nina (Nicki) Locker
22

23                                               Attorneys for Defendants
                                                 Pacific Biosciences of California, Inc., Hugh C.
24                                               Martin, Susan K. Barnes, Brian B. Dow, Brook
                                                 Byers, William W. Ericson, Michael Hunkapiller,
25                                               Randall S. Livingston, Susan Siegel, and David B.
                                                 Singer
26

27

28

## CERTIFICATE OF SERVICE BY NEXT-DAY DELIVERY

I, Elizabeth J. Blackey, declare:

I am employed in Santa Clara County. I am over the age of 18 years and not a party to the within action. My business address is Wilson Sonsini Goodrich & Rosati, 650 Page Mill Road, Palo Alto, California 94304-1050. I am readily familiar with Wilson Sonsini Goodrich & Rosati's practice for collection and processing of correspondence for next-day delivery by an express mail service. In the ordinary course of business, correspondence would be consigned to an express mail service on this date.

On this date, I served **NOTICE OF REMOVAL** on the person(s) listed below by placing the document(s) described above in an envelope addressed as indicated below, which I sealed. I consigned the envelope(s) to an express mail service by placing it/them for collection and processing on this day, following ordinary business practices at Wilson Sonsini Goodrich & Rosati.

Mary K. Blasy
SCOTT+SCOTT LLP
707 Broadway, 10th Floor
San Diego, CA 92101

David R. Scott
SCOTT+SCOTT LLP
P.O. Box 192
156 South Main Street
Colchester, CT 06415

Amber L. Eck
ZELDES & HAEGGQUIST, LLP
625 Broadway, Suite 906
San Diego, CA 92101

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Palo Alto, California on November 23, 2011.

Elizabeth J. Blackey

# EXHIBIT  A

1  SCOTT+SCOTT LLP
   MARY K. BLASY (211262)
2  707 Broadway, Tenth Floor          SSLLP/MKB
   San Diego, CA  92101
3  Telephone:  619/233-4565
   619/233-0508 (fax)
4  mblasy@scott-scott.com
     – and –
5  DAVID R. SCOTT
   P.O. Box 192
6  156 South Main Street
   Colchester, CT  06415
7  Telephone:  860/537-3818    SS22/DRS
   860/537-4432 (fax)
8  drscott@scott-scott.com

9  Counsel for Plaintiff

10 [Additional Counsel on Signature Page]

**FILED**
**SAN MATEO COUNTY**

OCT 2 1 2011

Clerk of the Superior Court

By _____
        DEPUTY CLERK

11                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                              COUNTY OF SAN MATEO

13

14 | GREG YOUNG, Individually and on Behalf of All   Case No.    **CIV 5 0 9 2 1 0**
   | Others Similarly Situated,
15                                                    CLASS ACTION COMPLAINT FOR
                                  Plaintiff,          VIOLATIONS OF THE SECURITIES ACT OF
16                                                    1933
        vs.
17
   PACIFIC BIOSCIENCES OF CALIFORNIA,
18 INC., HUGH C. MARTIN, SUSAN K. BARNES,             **JURY TRIAL DEMANDED**
   BRIAN B. DOW, BROOK BYERS, WILLIAM
19 W. ERICSON, MICHAEL HUNKAPILLER,                   **FILE BY FAX**
   RANDALL S. LIVINGSTON, SUSAN SIEGEL,
20 DAVID B. SINGER, J.P.MORGAN
   SECURITIES LLC, MORGAN STANLEY & CO.
21 INC., DEUTSCHE BANK SECURITIES INC.
   and PIPER JAFFRAY & CO.,
22
                                  Defendants.
23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Plaintiff Greg Young ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Pacific Biosciences of California, Inc.'s ("PacBio" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports and information about the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of Plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired the common stock of PacBio pursuant and/or traceable to the Company's *$230 million* initial public stock offering on October 27, 2010 (the "IPO") seeking to pursue *strict liability* remedies under the Securities Act of 1933 (the "Securities Act").

## INTRODUCTION AND BACKGROUND TO THE ACTION

2.    PacBio is a biotechnology company founded by two Cornell students, Hugh C. Martin ("Martin") and Stephen Turner ("Turner"), in 2004 to develop, manufacture and commercialize a new, unique gene sequencing system they (along with a third Cornell student) discovered.

3.    "DNA sequencing" includes the methods and technologies used to determine the order of the nucleotide bases – adenine, guanine, cytosine, and thymine – in a molecule of DNA. Knowledge of DNA sequences has become indispensable for basic biological research, other research branches utilizing DNA sequencing, and in numerous applied fields such as diagnostic, biotechnology, forensic biology and biological systematics. The advent of DNA sequencing has significantly accelerated biological research and discovery.

4.    *The first DNA sequences were obtained in the early 1970s by academic researchers using* laborious methods based on two-dimensional chromatography. Following the development of dye-based sequencing methods with automated analysis, DNA sequencing became somewhat easier and generally faster, but still prohibitively expensive due to the sheer density and speed with which DNA replicates itself. Virtually every human cell has two strands of DNA, each *three billion bases long*. Each time cells replicate,

- 1 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  a complete copy of its DNA must be made for each of the two new cells made by its division. Scientists and

2  researchers studying cancer, viruses, and other cell-growth anomalies required the means to observe and

3  analyze highly complex DNY mutation processes in real time. But using older gene-sequencing machines,

4  like those used to fully map the human genome for the first time in 2003, it still took six months with 1,500

5  machines running 24 hours a day to decipher one person's genome. And the process required $1 million to

6  $5 million worth of chemicals and solvents.

7       5.     When the International Human Genome Project was initiated in 1990, the race to improve

8  sequencing technology truly began in earnest. The project took 13 years to complete and cost nearly $3

9  billion to sequence a single human genome, too slow and too costly by modern standards. Since the project

10  was completed in 2003, next-generation sequencing technologies rapidly evolved, with each emerging

11  technology claiming to sequence a human genome (or multiple genomes, simultaneously) cheaper, faster,

12  and with greater accuracy. Companies like San Francisco-based Navigenics began promising to bring the

13  world of personalized medicine into the future by bringing into the physician's office table-top devices that

14  translate a patient's genome sequencing into actionable information that allows a physician to determine

15  which health risks his/her patients are genetically predisposed to and to make medical decisions in a matter

16  of minutes based on mutations in their DNA over time.

17       6.     In October 2006, the X Prize Foundation established an initiative to promote the development

18  of full genome sequencing technologies, called the Archon X Prize, intending to award $10 million to "the

19  first Team that can build a device and use it to sequence 100 human genomes [the full set of genetic material

20  consisting of paired chromosomes, one from each parental set totaling 6 billion base pairs] within 10 days or

21  less, with an accuracy of no more than one error in every 100,000 bases sequenced, with sequences

22  accurately covering at least 98% of the genome, and at a recurring cost of no more than $10,000 (US) per

23  genome."

24       7.     This high demand for low-cost sequencing again drove the development of so-called "third

25  generation," higher "throughput" (*i.e.* the volume of sequencing that a system can process in an hour)

26  sequencing technologies that could parallelize the sequencing process, producing thousands or millions of

27  sequences at once. High-throughput sequencing technologies lower the cost of DNA sequencing beyond

28  what was possible with the standard dye-terminator methods. These third generation sequencing companies

- 2 -

1  promised to increase the read length and accelerate the read time that the second generation technology
2  companies had sacrificed in an attempt to improve throughput over older first generation sequencers. The
3  read length feature on any sequencer is defined as the number of consecutive bases out of a genome that a
4  technology can provide before it faces limitations, such as a low resolution that can cause *inaccurate base*
5  *calling*. It is believed that the longer the read length, the more accurate the genomic map.

6      8.    PacBio's *RS* system was billed by Martin and Turner as a high-throughput system that ran a
7  single DNA molecule through a nanopore (a small hole in glass) and read the individual sequence of that
8  DNA molecule. PacBio's *RS* system utilized single molecule real time sequencing ("SMRT"), based on the
9  properties of zero-mode waveguides. By November 2008, Martin and Turner would tell *Bloomberg* that
10 their *RS* system could map DNA sequences *30,000 times faster* than competitors' methods, accelerating
11 researchers' work to unravel the complex mutations that cause human disease. In fact, Turner told
12 *Bloomberg* that their SMRT technology had the potential to decipher *a person's entire genome* in "about 15
13 minutes." According to Martin and Turner (as reported by *Bloomberg* in November 2008), "*[f]aster, more*
14 *accurate methods* of analyzing the DNA of humans and other organisms," like theirs, would "lead to a
15 better understanding of how normal organs and tissues develop, and how they go awry in conditions such as
16 diabetes and Alzheimer's disease." Martin explained that "[i]f you can sequence a human genome for *less*
17 *than $1,000 in a matter of minutes*, that will revolutionize health care,'' and that fast, cheap results would
18 make it possible to look for the complex series of genetic mutations that are involved in many diseases.
19 Turner said that once PacBio's *RS* system could deliver a patient's genome in 15 minutes, "at that point, this
20 becomes a market dominating technique," and "[t]here would be no reason to use any other." Critically,
21 Turner then claimed the *RS* system would allow "scientists to read three to five bases per second *with about*
22 *99.3 percent accuracy*."

23     9.    In November 2008, *Bloomberg* quoted investment bankers saying that the "annual market for
24 genome sequencing equipment made by Swiss-based Roche Holding AG, San Diego-based Illumina Inc.
25 and other companies [was then] about $1 billion and [would] to rise to $1.5 billion by 2013." Turner told
26 *Bloomberg* that while it would take PacBio until 2013 to finish developing machines that could "sequence
27 genomes in less than an hour," "within one year the company [would] begin delivering to customers an early
28 version *able to do the job in three days*" at a price per machine of "between $300,000 and $500,000." And

- 3 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   based on this promise, by November 2008, in what *Bloomberg* referred to as "the bleakest financing

2   environment in decades," PacBio had raised $200 million from venture capital firms.

3       10.    By 2009, PacBio competitor Beckman Coulter was reporting that its GenomeLab platform

4   was performing genome sequencing with a read length of 700 bases per sample and a 98% base-calling

5   accuracy in about a 100-minute cycle.  And Beckman Coulter was still using the older dye terminator

6   technology.  Roche's Genome Sequencer FLX, the first second generation system, had a 500-base pair

7   average read length.  Illumina Cambridge was sequencing one human genome for $100,000 in two months,

8   employing the efforts of 150 people.  Agilent Technologies was reporting a 300-fold enrichment in target

9   sequence, promising a 300-fold reduction in the cost of sequencing that target.  Applied Biosystems' SOLiD

10  third generation sequencing system claimed to allow users to attain a greater than 99.94% base calling

11  accuracy.  Helicos's HeliScope system was promising to complete genome sequence at 20 times coverage at

12  well below the $1000 threshold.  Unlike Helicos's technology, which had been criticized for extremely short

13  reads, typically around 32 bases, PacBio's SMRT sequencing promised long reads and good processivity.

14  Attempting to keep PacBio out in front of the steeple chase to keep the venture capital financing coming in,

15  Martin and Turner were claiming in March 2009 that the *RS* system was then capable of an average read

16  length of approximately 1,000 bases, with some instances of within-run maximums of 3,000-base read

17  lengths.

18      11.    By the fall of 2009, Martin would tell *The Journal of Life Sciences* that PacBio "expect[ed] to

19  go to market by the second half of 2010 with a device that [could] leave previous sequencing machines in

20  the dust."  According to Martin, the "goal [was] to sequence 3 base pairs – the pairs of molecules that make

21  up the rungs of the twisted DNA ladder-per second."  "With improvements to reagents, the chemicals used

22  to make possible the reading of the DNA, the device [would] eventually be able to complete 10 base pairs a

23  second."  "Eventually – about three years after the introduction of the first machine – Martin expect[ed] to

24  produce a follow-up device that [would] be able to sequence a genome at a rate of 50 base pairs a second

25  and at a cost of $100.  'When you go to the doctor and the doctor fills out the form and checks off blood,

26  urine, test this, test that, there isn't anything on that form that cost more than 150 bucks' … If we're going to

27  have a box that says 'sequence,' we are going to have to get it to the price point where it's in that class of

28  price."

- 4 -

12.     In May 2010, PacBio published an article in *Nature Methods* claiming the PacBio *RS* could detect methylation of DNA strands without altering the DNA. As promised, the PacBio *RS* was released to a limited set of ten customers in late 2010 as the Company prepared for its IPO.

13.     Prior to its IPO, the Company raised nearly $400 million in six rounds of primarily venture capital financing, making it one of the most capitalized startups in 2010. Key venture capital financiers included Mohr Davidow Ventures ("Mohr Davidow"), Kleiner, Perkins, Caufield & Byers ("Kleiner Perkins"), Alloy Ventures ("Alloy") and Maverick Capital Ltd. ("Maverick"), each of whom had directors on the PacBio Board of Directors (the "Board") at the time of the IPO. The Company raised approximately $230 million in its IPO priced October 26, 2010 and was listed on the NASDAQ under the symbol "PACB." In addition to providing the PacBio's venture capital financiers a liquid market to sell their PacBio shares in, the public stock listing provided tangible market value to the PacBio shares held in the venture capital financiers' portfolios.

14.     At the time of its IPO, the Company had never reported a single dollar in sales revenues, and while the 2010 "limited distribution" users had no financial obligation to purchase the *RS* systems they were trying out, according to the registration statement PacBio filed with the SEC to conduct the IPO, *the Company then expected to begin its wider public commercial release in early 2011 – and the Company then reported a $15 million sales backlog.* To use the PacBio *RS*, the registration statement also explained that customers would also have purchase reagent packs for DNA preparation and sequencing and small plastic cells called "SMRT Cells." Each cell would be slightly less than one centimeter square and contain thousands of zero-mode waveguides.

## SUMMARY OF THE ACTION

15.     In the fall of 2010, as the Company had geared up for its IPO, PacBio claimed the accuracy, speed, long read-rates and high throughput of its *RS* system distinguished it from other first and second generation gene sequencers where DNA had to first be amplified and the gene sequence was then determined by the combined signal of multiple identical DNA molecules. Defendants also claimed that reading a single molecule also allowed for longer read lengths, which cut down on sequencing time and increased throughput. Importantly, defendants claimed the PacBio *RS* had a *99.99% base calling accuracy rate*, knowing that the *RS*'s raw-read accuracy rate was only *80%-84%* and that would-be customers would

- 5 -

1    have to sacrifice long read length to obtain increased raw-read accuracy. Defendants also knew they were

2    rushing the *RS* system to market without taking the time to work out countless insidious "bugs" in the *RS*

3    system that caused it to be highly unreliable and crash often.

4         16.    Knowing the IPO window would close once the 2010 limited production users spread the

5    word to would-be commercial purchasers that the PacBio *RS* was unreliable, offered lower raw-rate

6    accuracy, and that, as such, the long read rates would have to be sacrificed to increase accuracy, defendants

7    rushed the *RS* system to market. This was done – without providing the comprehensive, accurate disclosure

8    to purchasers required in the IPO registration statement and prospectus (collectively, the "Registration

9    Statement") – knowing that only if and when the limited production users accepted *RS* system on

10   commercial terms would any sales revenues be derived – and knowing that other would-be commercial

11   purchasers were waiting in the wings waiting for feedback from the limited production users. While the

12   nature of this initial no-cost, "try out" phase was disclosed in the Registration Statement, significant defects

13   then known to defendants in the *RS* system, and significant negative feedback already received from the

14   limited production users, was omitted from and/or misstated in the IPO Registration Statement.

15        17.    The timing of PacBio's IPO was critical to defendants and their venture capital financiers – if

16   defendants had not put out a limited number of units to the limited production users for trial, the Underwriter

17   Defendants could not sell the IPO. Conversely, based on what Defendants knew then about the *RS* system's

18   true accuracy, reliability and read-rate length abilities, if Defendants allowed the limited production user

19   trial to go on too long before taking PacBio public, the truth would leak out and the Underwriter Defendants

20   could not sell the IPO.

21        18.    At the request of PacBio's securities counsel and its Underwriters, the SEC accelerated the

22   effectiveness of PacBio's Registration Statement on Form S-1 (File No. 333-145547) at 4:00 p.m. on

23   October 26, 2010 and PacBio conducted its ***$230 million IPO*** on October 27, 2010, selling 14.375 million

24   shares at $16 per share. Underwriters J.P.Morgan Securities LLC, Morgan Stanley & Co. Inc., Deutsche

25   Bank Securities Inc., and Piper Jaffray & Co. shared an estimated $16 million in underwriting fees in

26   connection with the IPO. Net of underwriting fees and other expenses, PacBio received approximately

27   $210.4 million in proceeds from the IPO. The Company's stock also began trading on the NASDAQ Global

28   Market under the symbol "PACB" following the IPO.

- 6 -

19.     Defendants in this action include PacBio, the PacBio executives and directors who signed the Registration Statement used to conduct the IPO and the underwriters to the IPO (collectively, "Defendants"). In violation of the Securities Act, Defendants were negligent by issuing false and misleading statements to the investing public relating to the IPO and the Registration Statement the Company filed with the SEC in support of the IPO.  Specifically, under the applicable SEC rules and regulations governing the preparation of the Registration Statement, Defendants were negligent in failing to disclose at the time of the IPO the following material facts concerning PacBio's business operations and their reasonable expectations of the eventual commercial viability of the *RS* system Defendants were aware of based on facts then present and known by Defendants:  (1) the Registration Statement materially overstated the status of the *RS* systems' development at the time of the IPO; (2) the Registration Statement omitted material facts concerning the *RS* system's relatively low raw-read rate accuracy, low throughput, low yields and that the relatively low raw-read rate, throughput, and yield would be significant to would-be commercial purchasers; (3) the Registration Statement omitted discussion of the serious "bugs" in the *RS* system based on PacBio's own trials and the feedback PacBio had thus far received from limited production use customers; (4) the Registration Statement omitted that would-be commercial purchasers would have to compromise read-rate length for raw-read accuracy; (5) the Registration Statement omitted discussion of the negative feedback limited production users were then providing to would-be commercial purchasers and that as such, many were unwilling to pay the relatively higher $700,000 for the *RS* system, as compared to the lower priced systems then available from better-funded competitors; (6) that the limited production trial users had all been promised a 50% discount on any actual purchase price, providing them with significant disincentive to go public with their complaints about the *RS* system until their final sales transactions were complete; (7) that Gen-Probe's pre-IPO $50 million "investment" was in reality a down payment for a system that would allow Gen-Probe to obtain the 50% discount; and (8) as a result of the foregoing, the IPO Registration Statement was false and misleading at all relevant times.

20.     Beginning on November 30, 2010 when the Company released its 3Q 2010 financial results, the investment community learned for the first time that the *RS* system had only an 80%-84% raw-read accuracy rate and that Defendants were then attempting to improve raw-read accuracy and to fix other "bugs" in the *RS* system that made it highly unreliable.  But as limited production users continued telling

- 7 -

would-be commercial purchasers about the low raw-read accuracy, explaining that the longer read-rates Defendants had promised distinguished this system from comparable systems being offered by better-funded competitors for less money, had to be compromised to increase raw-read rate accuracy, and learning of the significant bugs in the *RS* system, would-be commercial customers were flatly rejecting the *RS* system. When Defendants finally disclosed on August 5, 2011 (as part of the Company's 2Q 2011 financial result reporting) that the Company had signed significantly fewer new customers than the market had been led to expect, and that the majority of the current-period sales were coming out of sales backlog, the market punished the Company's stock, running it down to $6.50 per share by the close of trading on August 5, 2011. When the Company later announced on September 21, 2011 that it would have to slash a third of its workforce to preserve dwindling cash, the market further punished the Company's stock price pushing it down to $4.25 per share, ***nearly a quarter of the price the Company had been taken public at less than one year earlier.***

21.    Essentially unbeknownst to investors, PacBio's executives and Board took the Company public before they had completed fundamental research and development of the *RS* system, at a point in time they knew raw-read accuracy was too low for the product to be commercially viable, when they knew end-users would have to sacrifice the long read-rate that justified the *RS* system's relatively high $700,000 price to increase raw-read accuracy, and knowing significant bugs in the *RS* system rendered it highly unreliable. Instead, doing the IPO simply allowed the early investors – including the venture capital financiers who dominated the PacBio Board – to cash out and take profits and for management to realize substantial capital gains on their PacBio stock options. This action seeks recovery, including rescission, for innocent purchasers who suffered tens of millions of dollars in losses when the truth about PacBio emerged and its stock price was pummeled.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts. This action is not removable. The claims alleged herein arise under §§11, 12(a)(2) and 15 of the Securities Act. *See* 15 U.S.C. §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the Securities Act and venue is proper pursuant to §22 of the Securities Act. Section 22 of the Securities Act explicitly states

- 8 -

1  that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of

2  competent jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered

3  class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50

4  persons asserting claims under state or common law. This is an action asserting federal law claims. Thus, it

5  does not fall within the definition of "covered class action" under §16(b)-(c) *and therefore is not removable*

6  *to federal court. See Luther v. Countrywide Financial Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The

7  federal Securities Act of 1933 ..., as amended by the Securities Litigation Uniform Standards Act..., provides

8  for concurrent jurisdiction for cases asserting claims under the 1933 Act."); *Luther v. Countrywide Home*

9  *Loans Servicing LP*, 533 F.3d 1031, 1031 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933

10  creates concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically

11  provides that such claims brought in state court are not subject to removal to federal court.").

12      23.    This Court has personal jurisdiction over each of the Defendants named herein because they

13  conducted business in and/or were citizens of California at the time of the IPO (including PacBio, which

14  maintained its principal place of business in this state and county at the time of the IPO, and each of the

15  Individual Defendants, all of whom reside in California). Each of the Underwriter Defendants has offices in

16  and/or conducts significant business in this jurisdiction as well. The violations of law complained of herein

17  also occurred in California, including the preparation and dissemination of the materially false and

18  misleading Registration Statement complained of herein, which statements were disseminated into this State.

19  PricewaterhouseCoopers LLP of San Jose, California opined on the Company's financial statements and

20  disclosures proved in the Registration Statement. Davis Polk & Wardwell LLP, of Menlo Park, California

21  served as counsel to the Underwriter Defendants in the IPO. Wilson Sonsini Goodrich & Rosati,

22  Professional Corporation ("Wilson Sonsini"), also of Palo Alto, California, served as counsel to PacBio in

23  the IPO. As such, PacBio, the Underwriter Defendants, and all of the Individual Defendants conducted

24  extensive business in this State.

25      24.    Venue is proper in this Court because Defendants' wrongful acts arose in and emanated from

26  this County. At the time of the IPO, PacBio's executive headquarters were (and remain) located at 1380

27  Willow Road, Menlo Park, California, where all 369 of its employees (except sales and field staff), its

28  applications lab team and its "manufacturing facilities" were located at the time of the IPO. Individual

- 9 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1 | defendants Barnes, Dow, Byers, Ericson, Hunkapiller, Livingston and Siegel each reside in San Mateo

2 | County, and individual defendants Martin and Singer, who reside in Santa Clara and San Francisco counties,

3 | respectively, undertook activities related to the IPO from PacBio's San Mateo County headquarters.

4 | **PARTIES**

5 |      25.     Plaintiff Greg Young purchased PacBio common stock pursuant and/or traceable to the IPO

6 | and was damaged thereby.

7 |      26.     Defendant PacBio was incorporated in the State of Delaware in 2000.  PacBio was initially

8 | founded under the name Nanofluidics, Inc.  PacBio's principal executive offices are located at 1380 Willow

9 | Road, Menlo Park, California.

10 |      27.     Defendant Hugh C. Martin ("Martin") is, and was at the time of the IPO, PacBio's Chairman,

11 | Chief Executive Officer ("CEO"), President and a member of its Board.  In March 2009, Martin was granted

12 | an option to purchase 550,000 shares of PacBio at $3.86 per share. In February 2010, Martin was granted

13 | another option to purchase 150,000 shares of PacBio at $8.50 per share. In August 2010, in anticipation of

14 | PacBio's IPO, Martin was granted another option to purchase 250,000 shares of PacBio stock.  The

15 | Company also entered into a revised compensation plan with Martin in August 2010 that would not take

16 | effect until the successful completion of PacBio's IPO, pursuant to which Martin would receive an option to

17 | purchase another 150,000 shares of PacBio stock at the IPO price, that would vest upon achievement of

18 | certain financial metrics in 2011 and 2012. Not including the 400,000 options granted to Martin during FY

19 | 2010, the IPO Registration Statement discloses that Martin held options to purchase PacBio stock valued

20 | that were valued at over $3.8 million at the time of the IPO.  Martin exercised 342,461 options between the

21 | time of PacBio's IPO and the end of FY 2010, realizing a gain of more than $3.7 million. Comparatively,

22 | Martin's annual salary was set at $300,000 at the time of the IPO.[1]  Defendant Martin assisted in preparing

23 |

24 |

25 |

[1]      At the time of the IPO, Martin's brother, Roger Martin, had also served as PacBio's Senior Director,
26 | Quality since June 2009 and in that capacity had been granted options to purchase 22,500 shares of PacBio
   | stock $5.64 per share. Previously, Roger Martin had been engaged by PacBio as a contractor and in that
27 | capacity had been granted options to purchase 1,500 shares of PacBio stock at $2.52 per share.  With
   | PacBio's IPO being priced at $16 per share, Roger Martin's stock options were worth $253,545.
28 |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  and signed the false and misleading Registration Statement and assisted the Underwriter Defendants in
2  conducting PacBio's roadshow to conduct the IPO.

3      28.    Defendant Susan K. Barnes ("Barnes") is, and was at the time of the IPO, PacBio's Senior
4  Vice President and Chief Financial Officer ("CFO"). Barnes joined PacBio in February 2010. When she
5  joined PacBio, Barnes was granted options to purchase 375,000 shares of PacBio stock at an exercise price
6  of $8.50 per share. Based on the IPO being priced at $16 per share, the market value of Barnes' options rose
7  to $2.8 million in the IPO. Comparatively, Barnes' annual salary was set at $300,000 at the time of the IPO.
8  Defendant Barnes assisted in preparing and signed the false and misleading Registration Statement and
9  assisted the Underwriter Defendants in conducting PacBio's roadshow to conduct the IPO.

10     29.    Defendant Brian B. Dow ("Dow") is, and was at the time of the IPO, PacBio's Principal
11 Accounting Officer and Vice President of Finance. Defendant Dow assisted in preparing and signed the
12 false and misleading Registration Statement and assisted the Underwriter Defendants in conducting
13 PacBio's roadshow to conduct the IPO.

14     30.    Defendant William Ericson ("Ericson") is, and was at the time of the IPO, a PacBio director
15 and has been a member of its Board since 2004. Ericson has also served as a managing partner at Mohr
16 Davidow since 2000, and claims to have led Mohr Davidow's focus on personalized medicine investing
17 since 2003. Mohr Davidow, one of PacBio's biggest venture capital financiers pre-IPO, participated in
18 PacBio's $109 million July 2010 Series F convertible preferred offering, its $68 million October 2009 Series
19 E convertible preferred offering, its $50 million January 2007 Series D convertible preferred offering and its
20 $7.72 million August 2005 Series C convertible preferred offering. According to the IPO Registration
21 Statement, entities affiliated with Mohr Davidow owned 4,598,397 shares of PacBio at the time of the IPO,
22 or 12% of its stock. In light of Mohr Davidow's substantial ownership of PacBio, Ericson served on the
23 PacBio Board at Mohr Davidow's favor and received no directors' stipend from PacBio for serving as a
24 member of its Board (according to the Registration Statement). With PacBio's IPO priced at $16, the
25 market value of Mohr Davidow's shares grew to $73.5 million in the IPO. Defendant Ericson assisted in
26 preparing and signed the false and misleading Registration Statement.

27     31.    Defendant Brook Byers ("Byers") is, and was at the time of the IPO, a PacBio director and
28 has been a member of the Board since 2004. Byers has also been a venture capital investor since 1972 and

- 11 -

1  is a managing partner at Kleiner Perkins. Kleiner Perkins, another of PacBio's biggest venture capital

2  financiers, also participated in PacBio's $109 million July 2010 Series F convertible preferred offering, its

3  $68 million October 2009 Series E convertible preferred offering, its $50 million January 2007 Series D

4  convertible preferred offering and its $7.72 million August 2005 Series C convertible preferred offering.

5  According to the Registration Statement, at the time of the IPO, entities affiliated with Kleiner Perkins

6  owned 3,317,378 shares of PacBio, or 8.67% of its stock. In light of Kleiner Perkins' substantial ownership

7  of PacBio, Byers served on the PacBio Board at Kleiner Perkins' favor and received no directors' stipend

8  from PacBio for serving as a member of its Board (according to the Registration Statement). With PacBio's

9  IPO priced at $16, the market value of Kleiner Perkins' stock increased to approximately $53 million in the

10  IPO. Defendant Byers assisted in preparing and signed the false and misleading Registration Statement.

11        32.    Defendant Michael Hunkapiller, Ph.D. ("Hunkapiller") is, and was at the time of the IPO, a

12  PacBio director and has been a member of the Board since 2005. Since November 2004, Hunkapiller has

13  also been a general partner at Alloy Ventures, a venture capital firm. Alloy, another of PacBio's biggest

14  venture capital financiers, also participated in PacBio's $109 million July 2010 Series F convertible

15  preferred offering, its $68 million October 2009 Series E convertible preferred offering, its $50 million

16  January 2007 Series D convertible preferred offering and its $7.72 million August 2005 Series C convertible

17  preferred offering. At the time of the IPO, entities affiliated with Alloy Capital owned 2,637,246 shares of

18  PacBio, or 6.89% of its stock. In light of Alloy's substantial ownership of PacBio, Hunkapiller served on

19  the PacBio Board at Alloy's favor and received no directors' stipend from PacBio for serving as a member

20  of its Board (according to the Registration Statement). With the IPO priced at $16, the market value of

21  Alloy's stock increased to approximately $42.2 million in the IPO. Defendant Hunkapiller assisted in

22  preparing and signed the false and misleading Registration Statement.

23        33.    Defendant Randall Livingston ("Livingston") is, and was at the time of the IPO, a PacBio

24  director and has been a member of the Board since 2009. At the time of the IPO, Livingston had served as

25  VP for business affairs and CFO of Stanford University since March 2001. In that capacity, Livingston

26  caused Stanford University to order a limited production release version of the PacBio SMRT technology

27  system in late 2010. In payment for his services as a member of the PacBio Board and as Chairman of its

28  Audit Committee, Livingston received options to purchase 105,600 shares of PacBio stock during FY 2009,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  including a one-time grant in July 2009 when he joined PacBio of 40,000 options with an exercise price of

2  $5.64.  With the IPO priced at $16, Livingston's stock options gained a market value of more than $1

3  million upon completion of the IPO.  Comparatively, Livingston received $90,000 per year as a director fee

4  from PacBio for serving on the Board.  Defendant Livingston assisted in preparing and signed the false and

5  misleading Registration Statement.

6      34.    Defendant Susan Siegel ("Siegel") is, and was at the time of the IPO, a PacBio director and

7  has been a member of the Board since 2006.  Since March 2007 Siegel has also been a general partner at

8  Mohr Davidow.  Mohr Davidow was one of PacBio's biggest venture capital financiers, having participated

9  in its $109 million July 2010 Series F convertible preferred offering, its $68 million October 2009 Series E

10  convertible preferred offering, its $50 million January 2007 Series D convertible preferred offering and its

11  $7.72 million August 2005 Series C convertible preferred offering. At the time of the IPO, entities affiliated

12  with Mohr Davidow owned 4,598,397 shares of PacBio, or 12% of its stock.  In light of Mohr Davidow's

13  substantial ownership of PacBio, Siegel served as a director of PacBio at Mohr Davidow's favor and

14  received no directors' stipend from PacBio for serving on its Board (according to the Registration

15  Statement). With the IPO priced at $16, the market value of Mohr Davidow's shares grew to $73.5 million

16  in the IPO. Defendant Siegel assisted in preparing and signed the false and misleading Registration

17  Statement.

18      35.    Defendant David Singer ("Singer") is, and was at the time of the IPO, a PacBio director and

19  has been a member of the Board since 2006. Since 2004, Singer has also served as a limited partner at

20  Maverick Capital Ltd. ("Maverick"), a private investment firm, where he was responsible for the firm's

21  private investments globally.  Maverick was another of PacBio's biggest venture capital financiers, having

22  participated in PacBio's $109 million July 2010 Series F convertible preferred offering, its $68 million

23  October 2009 Series E convertible preferred offering, and its $50 million January 2007 Series D convertible

24  preferred offering. At the time of the IPO, entities affiliated with Maverick owned 3,493,333 shares of

25  PacBio, or 9.13% of its stock.  In light of Maverick's substantial ownership of PacBio, Singer served on the

26  PacBio Board at Maverick's favor and received no directors' stipend from PacBio for serving as a member

27  of its Board (according to the Registration Statement). With the IPO priced at $16, the market value of those

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   shares grew to approximately $56 million when the Company was taken public.  Defendant Singer assisted

2   in preparing and signed the false and misleading Registration Statement.

3          36.     Defendants Martin, Barnes, Dow, Ericson, Byers, Hunkapiller, Livingston, Siegel and Singer

4   are referred to collectively as the "Individual Defendants."  Individual Defendants Martin, Dow and Barnes

5   are also referred to herein as the "Executive Defendants," and Individual Defendants Byers, Ericson,

6   Hunkapiller, Livingston, Siegel and Singer are also referred to herein as the "Director Defendants."

7          37.     Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter of the Company's

8   IPO, and served as a financial advisor and assisted in the preparation and dissemination of PacBio's false

9   and misleading Registration Statement.  In accordance with its role as one of two co-managers of the IPO,

10  JPMorgan was allotted 35% of the shares to be sold in the IPO and was entitled to 35% of the underwriting

11  fee.

12         38.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was an underwriter of the

13  Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of

14  PacBio's false and misleading Registration Statement.  In accordance with its role as one of two co-

15  managers of the IPO, Morgan Stanley was allotted 35% of the shares to be sold in the IPO and was entitled

16  to 35% of the underwriting fee.

17         39.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the

18  Company's IPO, and served as a financial advisor and assisted in the preparation and dissemination of

19  PacBio's false and misleading Registration Statement.  Pursuant to agreement with the other underwriters,

20  Deutsche Bank was allotted 20% of the shares to be sold in the IPO and was entitled to 20% of the

21  underwriting fee.

22         40.     Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Company's IPO,

23  and served as a financial advisor and assisted in the preparation and dissemination of PacBio's false and

24  misleading Registration Statement.  Pursuant to agreement with the other underwriters, Piper Jaffray was

25  allotted 10% of the shares to be sold in the IPO and was entitled to 10% of the underwriting fee.

26         41.     Defendants JPMorgan, Morgan Stanley, Deutsche Bank and Piper Jaffray are collectively

27  referred to hereinafter as the "Underwriter Defendants."  PacBio, the Individual Defendants and the

28  Underwriter Defendants are also collectively referred to as "Defendants."

- 14 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

42. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. These Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

(a) The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $14 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize PacBio stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and the Executive Defendants, met with potential investors and presented highly favorable information about the Company, its operation, and its financial prospects. As detailed by JPMorgan (speaking on behalf of all Underwriter Defendants) in an October 22, 2010 letter to the SEC seeking that the Registration Statement be declared effective at 4:00 p.m. on October 26, 2010, as of that date, the Underwriter Defendants had already disseminated more than 5,000 copies of the Preliminary Prospectus dated October 4, 2010 in connection with their sales effort.

(b) The Underwriter Defendants also demanded and obtained an agreement from PacBio that PacBio would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that PacBio had purchased millions of dollars in directors and officers' liability insurance.

(c) Representatives of the Underwriter Defendants also assisted PacBio and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of PacBio, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning PacBio's operations and financial prospects.

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants, including their counsel at Davis Polk & Wardwell LLP, of Menlo Park, California, met with PacBio's lawyers, management and top executives in Menlo Park, California and engaged in "drafting sessions" between at least August and October 2010. During these

- 15 -

1  sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the

2  IPO, including the price at which PacBio stock would be sold; (iii) the language to be used in the

3  Registration Statement; (iv) what disclosures about PacBio would be made in the Registration Statement;

4  and (v) what responses would be made to the SEC in connection with its review of the Registration

5  Statement. As a result of those constant contacts and communications between the Underwriter Defendants'

6  representatives and PacBio management and top executives, the Underwriter Defendants knew, or should

7  have known, of PacBio's existing problems as detailed herein.

8          (e)      The Underwriter Defendants caused the Registration Statement to be filed with the

9  SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

10                        **SUBSTANTIVE ALLEGATIONS**

11            **Martin's Pre-PacBio Ventures in Obtaining Public Capital**

12        43.      Martin joined PacBio from Kleiner Perkins in 2004, where Martin had served as a "CEO

13  coach" between 2003 and 2004. Prior to joining Kleiner Perkins, between 1998 and 2002, Martin served as

14  chairman, president and CEO of ONI Systems, a high-speed optical networking company Martin founded

15  and took public in the Silicon Valley in 2000. Employing the same tact he would repeat in connection with

16  PacBio's IPO (and utilizing many of the same partners), prior to taking ONI public, Martin and ONI's

17  venture capital backers (which included Kleiner Perkins and Mohr Davidow), floated ONI shares to an

18  influential technologist at a significant ONI customer, Williams Communications Group, and to a well-

19  known Wall Street stock analyst, Paul Johnson, at Robertson Stephens.

20        44.      The stock placement had its intended effect. Though initially priced in the $14-$16 range,

21  ONI's underwriters would increase the IPO price range to $21-$24 a week before the ONI IPO, and would

22  ultimately price the ONI IPO at $25. On the heels of a pressure-packed, multi-city road show, ONI's stock

23  price closed up at $83 on its first day of trading, and in that single day, more than $10 billion in ONI market

24  capitalization was created. For their efforts, Williams and Johnson made $26 million and $9 million,

25  respectively, on their pre-IPO stock grants. ONI venture capital financiers Kleiner Perkins and Mohr

26  Davidow profited as well, with the market value of the ONI stock each had acquired for approximately $23

27  million increasing above $1 billion in the first day of trading.

28

                                        - 16 -

45.    However, in another pattern that would repeat at PacBio, ONI's losses continued growing after its IPO and by February 19, 2002, Martin was forced to announce he was selling ONI to Ciena Corp. for just $900 million in Ciena stock – *well less than one tenth of the market capitalization the ONI IPO created.* Undaunted, Martin moved onto ONI venture capital financier Kleiner Perkins where he served as a "CEO coach" from 2002-2003, prior to co-founding PacBio in 2004.

## PacBio Is Born

46.    Martin and Turner co-founded PacBio in 2004. Turner was a physicist who had completed his Ph.D. at Cornell University, where a graduate student named Jonas Korlach had approached Turner about inventing a way to observe the work of the enzyme polymerase. Polymerase is nature's DNA sequencing machine. As a cell divides, the enzyme travels along strands of DNA, making copies of the cell's genetic construction. If the two researchers could figure out how to meaningfully analyze how polymerase worked, they would be able to ascertain how it reads the stream of "bases"—the four types of building blocks strung together in DNA's helical structure—and makes copies. Korlach told *Business Week* in May 2011 that polymerase utilized an efficient process, explaining that "[p]olymerase runs along DNA at 1,000 bases per second ... That makes it extremely fast, and it can hold on for hundreds of thousands of bases, making extremely few errors." According to *Business Week*, Turner was intrigued, turned away from academia and set out to commercialize Korlach's dream.

47.    Turner's breakthrough was the creation of an examination process utilizing really small holes. Turner coated a piece of glass with aluminum, shot it with an electron beam, and made a series of holes small enough to hold one molecule each. According to *Business Week*, "essentially Turner and Korlach realized that they could fasten a polymerase molecule near the bottom of one of these holes and fill the well around it with a liquid made up of the four bases of DNA, known in scientific shorthand as A, T, G, and C," and "then attach fluorescent markers to each type of base, shine a light into the holes, run the DNA through like thread through the eye of a needle, and pick up the colors as the bases react with the polymerase. The crude lab technology worked well enough to convince Turner it could be the basis of a new tool for scientific discovery."

48.    According to *Business Week*, "[o]ne limitation of sequencing machines ha[d] been their inability to sequence an entire 3 billion-base strand of DNA in one go. Companies in the field appl[ied]

- 17 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   various techniques to carve up and analyze DNA, but they all tend[ed] to stumble over long, repetitive

2   strings of bases … That drawback mean[t] hundreds of millions of bases in the genome [were] left

3   unmapped." PacBio's use of polymerase meant its technology could handle much longer strings of bases,

4   known in the trade as "long reads." That breakthrough, plus the raw speed of PacBio's *RS* system, which

5   according to Defendants could analyze a SARS or cholera variant in minutes instead of the usual hours or

6   days, appeared to have the early *RS* customers excited. But speed alone would not suffice. Accuracy and

7   reliability were also paramount, and therein lay the *RS*'s weaknesses.

8         49.      Meanwhile, Turner knew he needed to be able to promise a quick commercialization of the

9   technology to get the investor backing needed to develop it. Between 2001 to 2003, Turner worked alone,

10   making refinements and trying to raise money. He and his wife crisscrossed the country, visiting venture

11   capitalists in Boston, New York, Baltimore, and the Silicon Valley, but had no luck until he met with Mohr

12   Davidow's Ericson in 2004. Mohr Davidow agreed to fund Turner's research, but required that his team

13   move to the Silicon Valley and that they hire Martin, with whom Mohr Davidow had made such a huge

14   return on the ONI IPO. Turner and Martin now had access to funding, but their new venture capitalist

15   friends were driven by profits and not altruism, so the two knew they would need to produce a working

16   product that could be commercialized in very short order.

17         50.      To distinguish *RS* from the other gene mapping technologies available by bigger, better-

18   funded companies like Illumina Inc., Life Technologies Corporation and Genomic Health Inc., Turner and

19   Martin had to convince the investment community that *RS* offered something these companies' technologies

20   lacked. That promise was *RS*'s long-reads, which Defendants claimed set *RS* apart by allowing it to

21   accurately, reliably and of course quickly map genes. Meanwhile, in a paper PacBio released on November

22   20, 2008, Turner claimed that its SMRT technology permitted scientists to read three to five bases per

23   second with about 99.3% accuracy. Unfortunately, unbeknownst to the investment community, *RS* was

24   lacking both in accuracy and reliability. And to bring the *RS* system's raw-read accuracy on par with that of

25   PacBio's competitors, end-users would need to compromise the long-reads – and put up with the *RS*

26   systems' crashes and antics caused by bugs in its system Turner and Martin had not yet been able to work

27   out.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    **PacBio Floats the "Limited Production" Trial SMRT Technology Systems Prior to the IPO**

2          51.      Hoping to gin the PacBio market like he had at ONI pre-IPO, on September 21, 2009, PacBio

3    issued a release entitled "Pacific Biosciences Expands Mission and Prepares for Commercialization -

4    Company Names Pat Brooks as VP of Sales and Randy Livingston as Board Member." At the time of the

5    IPO, Livingston had served as VP for business affairs and CFO of Stanford University since March 2001. In

6    that capacity, Livingston caused Stanford University to receive a limited production release version of the

7    PacBio SMRT technology system in 2010.  The Stanford limited production placement was useful in terms

8    of increasing PacBio's credibility as Stanford had founded its own Genome Technology Center in 1993 and

9    its researchers were well respected in the field.

10          52.      Then on February 23, 2010, the Company put out a release entitled "Pacific Biosciences

11    Announces Early Access Customers for its Single Molecule Real Time System - North American Early

12    Access Program *Sold-out*; Ten Institutions to Inaugurate 3rd Generation DNA Sequencing," which stated in

13    relevant part:

14          Pacific Biosciences, a private company developing a disruptive technology platform for real-
            time detection of biological events at single molecule resolution, today announced the 10
15          institutions *that have purchased* its Single Molecule Real Time (SMRT™) DNA sequencing
            system as part of the company's early access program in North America.
16
            The North American early access *customers* are: Baylor College of Medicine, the Broad
17          Institute of MIT and Harvard, Cold Spring Harbor Laboratory, the U.S. Department of
            Energy Joint Genome Institute, The Genome Center at Washington University, Monsanto
18          Company, the National Cancer Institute/SAIC-Frederick, the National Center for Genome
            Resources, the Ontario Institute for Cancer Research, and Stanford University.
19
            "We are delighted that our initial early access program *is already sold-out, and that we have*
20          *a range of customer types* including genome centers, cancer research institutions,
            commercial organizations, and universities interested in applying our SMRT technology to a
21          broad range of applications," said Hugh Martin, Chairman and Chief Executive Officer of
            Pacific Biosciences. "The wide array of applications that will be explored by our initial
22          *customers* will benefit from the key advantages of the SMRT system: long reads, fast cycle
            times, flexibility, and single-molecule resolution. This is what defines third-generation DNA
23          sequencing."

24          The first shipments to members of the early access program will begin in the first half of
            2010. Pacific Biosciences is also planning early access programs for Europe and Asia later
25          this year.

26          *"We see this as a potentially valuable tool that can be applied to a wide range of studies*
            *because of its versatility," said Michael Snyder, Ph.D., Professor and Chair of Genetics*
27          *and Director, Stanford Center for Genomics and Personalized Medicine. "We look*
            *forward to being part of the pioneering group of early adopters using this new generation*
28          *of DNA sequencing technology."*

- 19 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*Pacific Biosciences will use the 10-site early access program as a systematic way to garner feedback on the SMRT system and to ensure that it is fully prepared to scale its operations to meet expected demand at commercial launch in the second half of 2010.*

[Emphasis added.]

53.    As the SEC would later demand that PacBio clarify in the Registration Statement before declaring it effective, the Company's February 2010 release was misleading in that it inferred that Stanford and the other limited production users were "customers," when in fact these users had no financial obligation to purchase the PacBio *RS* system. As a result of the relationship, however, several Stanford professors still disclose they are PacBio "consultants," including Roger Kornberg and Joseph Puglisi, and PacBio executives and employees often speak at Stanford presentations.

54.    Similarly, publicly-traded, San Diego-based Gen-Probe Incorporated ("Gen-Probe"), a developer, manufacturer and marketer of molecular diagnostic products and services used primarily to diagnose human diseases, screen donated human blood, and ensure transplant compatibility, issued a joint release with PacBio on June 17, 2010 announcing a joint venture. That release, entitled "Gen-Probe Makes $50 Million Strategic Investment in Third Generation Sequencing Company Pacific Biosciences - Companies to Collaborate on Developing Products for Clinical Diagnostics Use ," stated in relevant part:

> Gen-Probe Incorporated and Pacific Biosciences announced today that Gen-Probe has made a $50 million strategic investment in Pacific Biosciences, a private sequencing company. In addition, the companies will work together to explore co-development of new integrated clinical diagnostics systems based on Pacific Biosciences' Single Molecule Real Time (SMRT(TM)) platform and Gen-Probe's expertise in diagnostics.
>
> Gen-Probe and Pacific Biosciences will initially collaborate on an exclusive basis for up to 30 months, with the goal of developing a longer-term, preferred business relationship aimed toward improving the diagnosis of human diseases. The companies can also purchase certain of each others' products on preferential terms.
>
> * * * *
>
> Gen-Probe's $50 million investment is part of a larger Series F private round of financing by Pacific Biosciences.

55.    PacBio's Registration Statement explained that at the time of the IPO, Gen-Probe owned 6,553,080 shares of the Company's Series F preferred stock, more than 5% of the Series F convertible preferred shares, for which Gen-Probe had paid $50 million. Based on the $16 per share PacBio's stock was priced at in the IPO, Gen-Probe's PacBio stock was worth nearly $105 million, *or 200+% what Gen-Probe*

- 20 -

1    *had paid for the Series F convertible preferred* – which it took no time cashing in following the IPO.[2]

2    Besides financial backing, the Gen-Probe investment provided PacBio with more market credibility.

3    <u>**PacBio Is Taken Public**</u>

4    56.    On or about August 16, 2010, PacBio filed with the SEC a Form S-1 Registration Statement

5    for the IPO.  Upon review of the initial Registration Statement, in a letter directed to Defendant Martin dated

6    September 10, 2010, the SEC expressly directed PacBio to more plainly explain its business and sharpen its

7    risk disclosures, stating in relevant part:

8    If you elect to retain the narrative disclosure accompanying your graphics on the front and
     back cover, *please also present a balanced portrayal of your company and business, such*

9    *as by also noting the business risks or challenges.* If such balancing disclosure is
     inappropriate for your graphics, please relocate the narrative disclosure to a more appropriate

10   section of your prospectus *where you can present balanced disclosure.*

11   \* \* \* \*

12   *Please tell us how your statements regarding the feasibility and superiority of your*
     *technology are reconcilable with your disclosure on page 10 that your products involve*

13   *"unproven...technology."*

14   Please provide us independent, objective support for the following statements:

15   \* \* \* \*

16   •    *that the design of your system "should facilitate rapid adoption"* (page 1);

     \* \* \* \*

17   •    *your belief that "the long readlengths produced by the PacBio RS will allow*
          *insights into biology that are not possible with existing technologies"* (page 3); and

18   •    *that your "system is easy to use and adopt"* and that sample preparation is "simple

19        and fast" (page 3).

     \* \* \* \*

20   *Please provide us with support for the market opportunity data and industry statistics that*
     *you have included throughout your prospectus....*

21   \* \* \* \*

22   *We note that many of the risk factors that you list here could apply to any issuer or*
     *offering.* Please revise to present the most significant risk factors that make *this offering*

23   *speculative or risky.* In addition, *please expand your discussion of the risk factors to*
     *balance the positive elements that you have chosen to highlight in the rest of your*

24   *prospectus summary....*

25   \* \* \* \*

26   [2]    According to the Company's April 29, 2011 annual proxy statement to shareholders, following the

27   offering, Gen-Probe sold or other otherwise disposed of half of its PacBio shares, and then retained only
     3,276,540 shares.

28

- 21 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Since you have not yet commenced commercial sales of your products, *please indicate the basis for your disclosure that you "expect to experience rapid and substantial growth."*

* * * *

*Please note that your revised disclosure should be presented clearly so it is understandable to an investor who is not an expert in your industry.*

* * * *

*Please provide us with independent, objective support for your statements regarding the efficacy and accuracy of your technology.....Please also revise to ensure that your disclosure in this section is balanced,* particularly in light of your risk factor disclosure on page 10 that your products will include "unproven" technology.

* * * *

*Please disclose any positive or negative feedback that you have received from the entities that are using your products as part of the limited production release program.*

* * * *

Please explain in greater detail how the board of directors determined that Messrs. Byers, Ericson and Singer and Dr. Hunkapiller qualify as "independent directors" *given their beneficial stock ownership and that their affiliates are parties to your investor rights agreement.*

* * * *

*Please tell us why you have not provided disclosure of the collaboration agreement with Gen-Probe, a 5% or greater shareholder,* as discussed on page 64 of your registration statement.

* * * *

*We urge all persons who are responsible for the accuracy and adequacy of the disclosure in the filing to be certain that the filing includes the information the Securities Act of 1933 and all applicable Securities Act rules require. Since the company and its management are in possession of all facts relating to a company's disclosure, they are responsible for the accuracy and adequacy of the disclosures they have made.*

[Emphasis added.]

57.    Again on September 29, 2010, following communications with PacBio's outside securities counsel at Wilson Sonsini (which according to the Registration Statement also owned 31,607 shares of PacBio preferred stock), the SEC wrote Defendant Martin seeking further sharpening of the Registration Statement disclosures, demanding in relevant part:

....*Please tell us how you have determined "that all seven limited production release customers [are expected to] accept such instruments after testing is completed and will ultimately accept the commercial release version."*

* * * *

Please expand your disclosure in response to prior comment 69 to provide all information required by Regulation S-K Item 404(a), *including the basis upon which Gen-Probe Incorporated is a related party and the approximate dollar amount involved in the transaction.*

- 22 -

1   [Emphasis added.]

2        58.    After several rounds of amendments, at the request of Defendants, the Registration Statement

3   was declared effective by the SEC at 4:00 p.m. on October 26, 2010.  That same day, the Company

4   commenced its IPO valued at more than $230 million, including the Underwriters' overallotment at $16 per

5   share, which was right in the range initially predicted for pricing.

6        59.    Conversely, when gene-mapping competitor Complete Genomics went public just a few

7   weeks later on November 14, 2010, it had to scale back its offering price 30% to close the IPO and its stock

8   closed down another 10% on it first day of trading.  Unlike PacBio, Illumina, Life Technology and Roche,

9   Complete Genomics offered sequencing services rather than selling a sequencing system to the end user.

10   Researchers shipped samples to Complete Genomics' lab, it performed the sequencing, and then provided

11   the results over the internet.  Complete Genomics claimed accuracy levels of nearly 100% at a cost that was

12   significantly less than buying a gene sequencer and operating an in-house lab – but unlike PacBio, Complete

13   Genomics was understood to still be an early stage in its development and had just recently begun ramping

14   up to full-scale production, and despite beginning to see some sales, was understood by the investment

15   community to have a significant cash burn problem at the time of its IPO.

16            **The Truth About the Defects in PacBio's _RS_ System Begins to Emerge**

17        60.    On November 30, 2010, PacBio released its 3Q 2010 financial results for the quarter _ended_

18   _September 30, 2011_, admitting that the PacBio _RS_ was performing at a single molecular raw read accuracy

19   rate of just 80%-85%, whereas competitors like Ion Torrent's Ion PGM was were achieving 99% accuracy.

20   _The Company's release issued that day stated in relevant part:_

21        **Highlights of Limited Production Release Program**
        As of today, the Company has shipped all eleven systems included in its beta testing, or
22        Limited Production Release program. Of those eleven systems, ten have been installed and
        eight have been accepted. The system performance specifications for the limited production
23        release program include:

24        •            Average readlength of 500 to 550 bases
        •            99.99% Consensus accuracy
25        •            _**80% to 85% Single molecule raw read accuracy**_

26   [Emphasis added.]

27

28

- 23 -

61.    During the earnings conference call that followed PacBio's release later that day, Martin explained some of what Defendants had learned from the limited production trial prior to the IPO, which Martin said was "designed to give feedback on [PacBio's] initial products." Martin explained that in exchange for participating in the limited production trial, end users had been promised they could pay discounted prices for the *RS* systems if they agreed to purchase it. Martin also now conceded that PacBio's expectation all along was "that in the beginning [of the limited production trial, the *RS* system] *would have lots of bugs*," and "installation issues." According to Martin, Defendants believed pre-IPO that "[o]ver time the systems would become more stable and we would then start to incrementally increase the performance with consumables and software upgrades," and that was "how [the Company would] continue to increase the performance for [its] full commercial release." Martin further explained the Company was "currently in the process of updating a number of the beta sites to [its] next release," with the "upgrade" including "new software features, *bug fixes,* and a new enzyme chemistry." Martin also explained that "[a]t the sites that have received those upgrades, we have seen nice progress with increased readlength *and accuracy.*" Martin further explained that the "hardware design [for the commercial release was] substantially complete" and would begin shipping in the first half of 2011, stating that the "[t]he hardware design now includes *changes based on the feedback from the beta test customers* and most of those changes are related to *serviceability and stability*." Martin explained that "[i]n the area of software, we *continue to add bug fixes*…." Later in the call Martin would confirm that Defendants had this information prior to the IPO, explaining "every single day I get a report early in the morning that gives me not only the actual statistics for how the machines [in the limited production trial] are running in terms of performance metrics, but I also get some qualitative data on how it's going," lauding "the progress [PacBio had] made from July through now" based on that feedback.

[Emphasis added.]

62.    Barnes echoed Martin's disclosures about the price concessions offered to those participating in the limited production trial, explaining the Company would "bill and [was] entitled to collect 50% of the selling price of the *RS* instruments upon customer acceptance of the beta units." PacBio Vice President of Finance and Treasurer Ben Gong ("Gong") then explained that the Company's backlog at the end of the 3Q 2010 (which had ended prior to the IPO) "was approximately $20mm, up from approximately $15mm at the

- 24 -

end of Q2," explaining this "increase of $5mm reflects eight additional systems added to our backlog bringing the total to 32 systems." Gong further explained that *"[a]ll 32 systems were sold at the less price of $695,000."* Later Gong confirmed that *"our sales force is continuing to sell, as evidenced by the growth in the backlog."* Martin later echoed Gong's bullish sales demand promises, stating "some people are really anxious and they want to get their systems, they want to understand what's going on and really be part of the PacBio family," "[s]o a lot of the energy goes into working with customers in backlog, and quite frankly, a lot of – some of that energy goes into turning away customers because we just – especially globally, we want to be very thoughtful about how we roll out various territories. And I – despite how badly somebody in say, Japan right now might want to buy even multiple systems, we want to be thoughtful about that. *So we've got to manage that demand.*"

[Emphasis added.]

63.    When specifically questioned by a JPMorgan analyst as to how the "upgrades" would increase accuracy, Turner responded that while the "full commercial release chemistry [was] expected to maintain the 99.99 and higher consensus accuracy," he was forced to admit "the expected *raw read accuracy [would] be between 85% and 90%."* Turner explained that if PacBio continued using "the present engineering methods," PacBio saw "a pathway for [the Company] to get to 95% raw read accuracy," but that it would *"need to switch to new method, say for example in the area of protein engineering in order to realize the gains that are physically possible beyond 90%."*

[Emphasis added.]

64.    In response to the same JPMorgan analyst's inquiring about ongoing "yield improvements," stating PacBio had "talked about getting from 30% to 90%," Turner responded "this is something that we have talked with *some of you* about *already*." Turner said the Company's "current protocols rel[ied] on a random distribution of the DNA polymerase molecule, [s]o in each of our confinement devices the Zero Mode Waveguides, it means that we could have one polymerase, one and only one, or randomly we could get zero or we could get two or more," stating "[w]e only get useful sequencing from Zero Mode Waveguides that have one and only one polymerase in it and that's what limits the yield today to around 30%." Turner explained that to "move beyond this limit, we're developing what we call a Super Poisson technology [to] provide in each one of those Zero Mode Waveguide wells a unique mounting point that can

- 25 -

1  accommodate one and only one polymerase," explaining the Company had "already gotten good proof of

2  principle on demonstrating this mounting point and its ability to uniquely allow just one polymerase *and, of*

3  *course, development continues* in combining that with the sequencing technologies."

4  [Emphasis added.]

5      65.    While the market was temporarily mollified by Martin's and Turner's assurances,

6  Underwriter Defendant JPMorgan included a new risk factor in its report covering the Company's 3Q 2010

7  results (issued December 5th but embargoed publicly until December 12th), now including the warning of a

8  "[d]elay *or inability* to improve throughput and data quality from the instrument, particularity read length

9  and yield," and emphasizing that the "low raw-read accuracy of the system *has given some pause.*"

10  JPMorgan also warned that PacBio had a "higher" 3Q 2010 "cash burn than we [had] anticipate[d],"

11  potentially necessitating further capital before the company reaches profitability," emphasizing that "[if]

12  profitability is pushed much beyond 2013 … further capital may be necessary." However, continuing to

13  trumpet the Executive Defendants' positive message that commercial demand remained high for the *RS*

14  system, JPMorgan concluded its report continuing to predict a "*strong ramp up in instrument placements*

15  but low consumable utilization," emphasizing that *"[w]ith a $20M backlog and roughly 100 instruments in*

16  *the sales channel, we think there will be meaningful demand from early adopters."*

17  [Emphasis added.]

18      66.    In its December 5th report, J.P. Morgan initiated coverage on PacBio with an "Overweight"

19  rating and set a December 2011 price target of $17 for its stock.  In a follow-up report issued December 9th,

20  JPMorgan confirmed those ratings, *emphasizing that "raw read accuracy is the wrong metric to be focused*

21  *on, in our view."*  The Company's stock price, which had declined to below $12 per share in the days

22  leading up to the November 30th announcements, swiftly recovered and the Company's stock traded above

23  its $16 IPO price by late December 2010.

24  [Emphasis added.]

25      67.    The accuracy disclosure was not missed by all though.  For instance, on December 14, 2010,

26  *Nature* published a story entitled "DNA Sequencing for the Masses," comparing the PacBio *RS* to Life

27  Sciences' Ion PGM, with read rates of 100 base chunks of DNA at a time but sold for only $49,500, to

28  PacBio's *RS* that sold for $700,000 and had read rates of 500 base chunks of DNA at a time.  Noting that

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  Life Sciences' was "a price that is affordable to many labs," *Nature* reported that not only was the PacBio

2  *RS* not "priced for individual labs," "[a]t an investor meeting last month, Pacific Biosciences noted that its

3  machines were so far performing at an accuracy of *just 80-85%*, whereas Ion Torrent says that its machines

4  can achieve *99% accuracy*."

5  [Emphasis added.]

6       68.    Seeking to further reassure investors, at a January 11, 2011 J.P. Morgan Healthcare

7  Conference, Turner confirmed "[t]here's been a lot of discussion about, gee, what does accuracy, raw read

8  accuracy really mean, how important is it"?  Trying to assuage the investment community, Turner again

9  confirmed (as he had to) that *RS's* "accuracy was 81 to84%," but emphasized that "there is something called

10  fold coverage, which is how many times you actually have to sequence the genome," stating "we did that

11  only 12 times and we were able to tell what the genome was compared to other competitors who are

12  typically up in the range of 30 to 45 times."

13       69.    While fold coverage was important to end-users, as Martin would concede at the February 15,

14  2011 4Q 2010 earnings conference, *"[t]he three most important products specifications are read-length,*

15  *accuracy and throughput."*  Indeed, during the call, Martin specifically highlighted results purportedly

16  achieved by one limited production trial user, saying it had "achieved 100% coverage and 100% accuracy."

17  But overall, Martin stated that its "beta sites…showed an average read-length achieved of 1,500 bases and

18  an average raw read accuracy of 85%," stating that "[b]oth of these metrics are sufficient for full customer

19  [inaudible]," and that PacBio "plan[ned] to start commercial shipments during Q2 of this year." Martin also

20  emphasized that PacBio's "sales organization continues to build our backlog, which measured 38 systems at

21  the end of Q4." Later in the call, Martin stated *"I know there has been this whole huge controversy, I will*

22  *call it around raw read accuracy,"* but minimized it as a concern not shared by the "highly knowledgeable,"

23  who "understand the issues and were just thrilled quite frankly with what they were being able to see with

24  read lengths."

25  [Emphasis added.]

26       70.    During the call, Martin put further color on one of the *RS* systems' problems that was

27  disclosed in the Registration Statement, stating "one of the effects that actually terminates or limits our read

28  length, and I'd say limits recognizing that it's on average 1,500 bases today, is an effect called photodamage

- 27 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  where laser illumination can over time cause the enzymes to die off," stating "one way that we can

2  dramatically increase the read length, effective read length is to image say for 500 bases with the lasers on,

3  turn the lasers off, the enzyme continues to run, so we get a blank period where we get no read, but it's the

4  same molecule, then we turn the lasers back on and we can turn them off and turn them on, we call that

5  strobing." Responding to how the "upgrades" were going at the limited production sites, Martin explained

6  that the Company had "one site right now that is the upgrade is completed and … so far their response has

7  been tremendous in terms of the *improved reliability, stability, the variability on throughput has gone*

8  *down tremendously* and of course the overall *throughput has gone up a lot*," noting however that PacBio

9  still needed to remedy *"some [more] bug fixes."* Specifically discussing the accuracy problems, Martin

10  emphasized that while PacBio was "very excited about read lengths," "[a]ccuracy is going to be a lot of

11  work," stating it would likely require a "trade-off read lengths and accuracy." Specifically, Martin said "we

12  can turn up the laser power which of course is going to increase photo damage which would tend to lower

13  your read length, but at higher laser power, the die signals are much brighter and so the accuracy goes up. So

14  it is possible that in the future, we may offer a read length mode and an accuracy mode." Martin explained

15  that while for "re-sequencing," "the raw read accuracy at around 85% that we have" was sufficient, PacBio's

16  "customers [were] telling [management] they'd really like to see us for de novo sequencing, especially de

17  novo mammalian, *they'd like to see if it's 90% or greater*." In response to an analyst's further inquiry "as

18  you talk to your potential customers, *what are some of the key factors holding them back, maybe, from*

19  *placing an order at this point?* And you know, specifically in terms of your current throughput, is that an

20  issue that comes up in your conversations for the type of customers that you are currently targeting?,"

21  Martin emphatically retorted "No, it doesn't. I think they – *the biggest issue that comes up at our*

22  *conversation is when they can actually get the system…..*"

23  [Emphasis added.]

24      71.    On February 18, 2011 J.P. Morgan again noted that "Accuracy also remains an area of

25  focus," stating certain "researchers were concerned that either longer reads would result in higher error

26  rates," but explained that even with a low accuracy rate the PacBio *RS* could be used for agriculture

27  bioscience and diagnostics, where its long read rate would overcome the lack of accuracy.  Again,

28  emphasizing that "[b]acklog for PacBio *RS* continues to grow heading into midyear commercial launch,"

- 28 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  and that "Backlog, *which remains the most important metric for investors at this stage,* grew to 38 systems

2  ($24M) from 32 reported in 3Q," J.P. Morgan continued to rate PacBio's stock Overweight and left its

3  December 2011 price target at $17 per share. *Significantly, the J.P. Morgan report for the first time*

4  *disclosed that Gen-Probe was one of PacBio's limited production trial users.*

5  [Emphasis added.]

6      72.    On March 16, 2011 Oppenheimer initiated coverage on PacBio with a Perform rating and a

7  $15 price target, stating that "[a]lthough the system delivers on the promise of increased read length and low

8  cost per experiment, *it has disappointed on raw read accuracy and overall throughput.*" However, as J.P.

9  Morgan had, Oppenheimer was mollified by the purported demand for the PacBio *RS* Defendants had

10  discussed in the Registration Statement, emphasizing that "[w]ith a 38 system backlog ($24M), we see little

11  risk to our first year estimates."

12  [Emphasis added.]

13      73.    The Company then reported its FY 2010 and 4Q 2010 financial results on March, 23, 2011,

14  which were filed with the SEC in an Annual Report on Form 10-K, providing additional disclosures that was

15  not provided in the Registration Statement but should have been.  According to the Registration Statement,

16  PacBio's research and development "strategy" was to "[c]ontinually enhance product performance to

17  increase market share," emphasizing that "[t]he design of the PacBio RS will allow for significant

18  performance improvements *without an upgrade or replacement of the instrument hardware,*" emphasizing

19  that "[t]hese *performance enhancements* will be delivered through software upgrades and new

20  consumables," that PacBio's "flexible platform *[was] designed to generate a recurring revenue stream*

21  through the sale of proprietary SMRT Cells and reagent kits," and that PacBio's *"research and development*

22  *efforts are focused on product enhancements to reduce DNA sequencing cost and time as well as expand*

23  *capabilities,"* such that Defendants then believed based on information available to them at the time of the

24  IPO that the Company's "ability to offer performance improvements *without requiring new hardware*

25  *investment by our customers* [would] increase the attractiveness of [it's] products."  Conversely, the

26  "Research and Development" section in the 2010 Annual Report issued March 23, 2011 would now explain:

27          We plan to continue investment in research and development to support the ongoing
development of chemistry components and protocols to enhance overall system performance.

28          *Our goals are to continuously improve sequencing readlength, raw read accuracy* and the

- 29 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

number of reactions on each SMRT Cell, *as well as* to develop and introduce into the marketplace new applications that will take full advantage of our single molecule, real-time detection technology. *In addition, our engineering teams will __continue their focus__ on increasing instrument component and system reliability,* reducing costs, *increasing sample throughput,* and implementing additional system flexibility and versatility.

[Emphasis added.]

74.     Reporting again on April 27, 2011 in connection with the Company's 1Q 2011, Martin would disclose that the "last upgrade was the most complex of the entire beta program as the increase in throughput exercise the full capability," but advised that "[r]ead-length and accuracy are approximately the same as we reported in February despite the huge throughput increase as the chemistry has not changed significantly." Martin also confirmed that raw-read accuracy remained at 80%-85%, subjecting the Executive Defendants to more grilling inquiry from analysts. One analyst inquired whether the customers receiving the new "base-calling" upgrade software were obtaining better accuracy. Martin responded that even with the new final release that would begin rolling out "soon," while "that release [would] have all of the improvements that we're talking about," "I still think that from an accuracy point of view, *I think we should probably be thinking somewhere in the 86% to 88% range*." During the call, however, Dow stated that PacBio had finally "begun to ship commercial products and therefore…anticipate[d] recording revenue for [its] products starting [that] quarter." Dow explained that "[f]or the full year of 2011, [PacBio] expect[ed] to record approximately $35mm in total revenue" and that "at March 31, [the Company's] backlog was approximately $28mm, up from approximately $24mm at the end of the previous quarter." While Martin would not respond to requests for more clarity as to customer acceptance in the field or break down that annual revenue target on a quarterly basis, he did confirm "that vast majority of the revenue [was] probably going to come from systems," adding that "from the usage we're seeing from the beta sites, we expect to have pretty good consumable orders coming through."

[Emphasis added.]

75.     As detailed in one analyst's "Genetic Analysis Survey 2011: What Research Labs are Saying About Sequencers" publicly released on April 14, 2011, "PacBio RS fits a clear niche, *although technical hurdles remain*," emphasizing that "[r]read length and chip cost were cited as positives by respondents, *while raw read accuracy, throughput, and instrument footprint were listed as clear negatives*."

[Emphasis added.]

- 30 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

76.     As a result of the November 2010 to April 2011 disclosures, the market had learned of some of the defects present in the *RS* system at the time of the IPO that had not been disclosed in the Registration Statement, but the Company's stock was still trading relatively high as the investment community was mollified by Defendants' claims that the research community absolutely clamoring for the *RS* system, despite its many defects. Nonetheless, on May 13, 2011, *The Motley Fool* published an article entitled "Pacific Biosciences Has a PR Problem," which emphasized that the disclosures had taken some of the wind out of PacBio's sales, stating in relevant part:

> Pacific Biosciences of California has gotten a lot of lift from its own sound bites, too: It gained a great deal of notoriety a few years back by claiming it would be able to produce a complete, high-quality human genome in 15 minutes by 2013, for a cost of only around $1,000. *These claims -- backed by some truly virtuoso science -- helped the company land $370 million in venture capital and another $200 million from its October 2010 IPO.*

[Emphasis added.]

77.     In fact, the *Motley Fool* article included direct quotes from Martin conceding that he had intentionally overstated the status of the *RS* systems' development at the time of the IPO:

> CEO Hugh Martin put it to me another way when I visited the company this week. *"How do you raise $370 million as a private company? You raise $370 million saying, 'I want to show you where we can go.' So that's what we did."* Yet Martin says the company isn't backing off its original claims about the stunning gains the company will make in the speed and cost of sequencing *(though he is careful to avoid any comments about timing).*
>
> "We know how to do this," he says. *"But we had to get to market quickly. And so once you have something to sell, the last thing in the world you want to be doing is waving your arms about [what the company can eventually achieve]; you want to be waving your arms about what you're selling."*
>
> *That change of focus and some early stats on the machine -- notably its relatively low 85% single-pass accuracy rate versus a similarly priced HiSeq machine from Illumina* (Nasdaq: ILMN ) -- *has given doubters a lot of ammunition.* That's a shame, perhaps, for investors who bought into the IPO, as they've seen the stock price crumble about 30% from its debut price of $16.50 per share....

[Emphasis added.]

78.     Finally, on August 4, 2011, after the close of trading, PacBio reported its 2Q 2011 financial results for the quarter ending June 30, 2011. While the Company's sales revenues, net income and EPS handily beat analyst expectations, the market was shocked to learn that PacBio had received only seven new orders for *RS* systems during the quarter, when the consensus in the market – based on Defendants' previous bullish statements – was that at least 15 new orders could be had – *or 200% more sales than PacBio could deliver*. Moreover, 11 of the 16 systems PacBio did sell during the quarter were from backlog, dramatically

- 31 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  decreasing backlog to 35 systems, or $22 million. This was the second quarter in a row that PacBio's net

2  orders had fallen short of expectations and its executives were this time questioned extensively by analysts

3  during the conference call held that day about what the Company was doing to shore up demand by

4  increasing accuracy and reliability. Cash burn was also an area of immense concern, as the slower

5  acceptance by commercial buyers meant less cash sales could be expected in the near future.

6      79.    Attempting to defend the Company's accuracy improvements, Martin explained that during

7  the 2Q 2010, the Company had "finalized the specification of [its] C2 upgrade chemistry that [would] be

8  shipped in the forth quarter," stating "[r]ead-length will increase from the current 1,000 base pairs to an

9  average of 2,700 ... t]hroughput will double from the current 35% to 45% mega bases per SMRT Cell to 90

10 mega bases per SMRT Cell," and that "[s]ingle path to accuracy will increase from *85% to 87%* ... with an

11 insert size of 1,350 bases *will yield a single molecule accuracy of over 93%*." Significantly, Martin

12 admitted for the first time that *to reach 99% raw read accuracy*, users would have to use a base insert of just

13 500 and that if they chose a base insert of 2,500 to 10,000 bases (*i.e.* the so-called "long" read rates earlier

14 promised), *the best raw-read accuracy they could expect was 87%*. Later in the call, Martin admitted that

15 *RS's "initial raw read accuracy of 85% limited some of [PacBio's] users to certain applications."* In

16 response to another analyst's direct questioning, *Martin again admitted that end-users would simply have*

17 *to "trad[e] read length for accuracy,"* something commercial purchasers obviously were not willing to do.

18 [Emphasis added.]

19     80.    On August 5, 2011, Underwriter Defendant J.P. Morgan issued a report cutting its rating on

20 PacBio from Overweight to Neutral, stating that due to a slower ramp up in orders now being expected, it

21 was "lowering [its] 2012 projection for systems recognized from 170 to 90," *a cut of almost 50%*, and as

22 such J.P. Morgan was now "not forcast[ing] operating profitability until after 2015" – *well after PacBio*

23 *would run out of cash*. J.P. Morgan also lowered its December 2011 price target for PacBio stock *down to*

24 *$10*.

25     81.    The market's reaction to Defendants' admissions and J.P. Morgan's response was swift and

26 furious. As a result of these disclosures, the Company's stock price plummeted *more than 34%* from its

27 close of $9.90 on August 4th to close at $6.50 on August 5th on unusually high trading volume of nearly

28 five times the average daily trading volume over the previous thirty trading days.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

82.     On September 21, 2011, again citing the slower-than-expected adoption rate for *RS*, PacBio was forced to disclose that cash burn was jeopardizing its operations so badly that it was laying off 130 employees – roughly one-third of those it had at the time of the IPO – and that the Company would incur separation expenses exceeding $5 million on these employees.  J.P. Morgan would cut its rating to Underweight, and its price target to $8. Piper Jaffray cut its rating from Overweight to Neutral and its price target from $12 to $7.  The Company's stock again plummeted *25%*, closing down at $4.25 on September 21st from its close of $5.56 on September 20th, again on unusually high trading volume of more than three and half times the average daily trading volume over the past thirty trading days.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

83.     The $230+ million IPO was completed on November 1, 2010 with the delivery of shares and final prospectus delivery.  The Registration Statement contained material false and misleading statements, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

84.     Purporting to provide a business "Overview," the Registration Statement claimed that PacBio's "SMRT technology uses the natural processing power of enzymes, combined with specially designed reagents and detection systems, to record individual biochemical events as they occur," that the "ability to observe single molecule events *in real time provides the research community with a new tool* for investigating basic biochemical processes such as DNA synthesis," and that Defendants "believe[d the] SMRT technology ha[d] the potential to advance scientific understanding *by providing a window into biological processes that has not previously been open*."  The Overview also stated that defendants "believe[d] that the PacBio RS, which uses [a] proprietary SMRT technology, maintains many of the key attributes of currently available sequencing technologies *while solving many of the inherent limitations of previous technologies*," specifically that it *"provide[d] long readlengths,* flexibility in experimental design, fast time to result and [was] designed to be easy to use."

[Emphasis added.]

85.     These statements in the Registration Statement concerning the business "Overview" were materially inaccurate.  First, the statements, which were made in conjunction with the IPO, concealed/misstated that there were significant "bugs" in the PacBio *RS* system that was making it highly

- 33 -

1  unreliable in the hands of users. It also omitted the low raw-read accuracy rate. Finally, it concealed that

2  once end-users slowed down the base coverage to improve accuracy, the advantages of the PacBio *RS*

3  system compared to its better-funded competitors disappeared, and that that given that option, end-users

4  would opt to purchase the better-funded company's product.

5         86.    Concerning sales demand *then* being experienced for the Company's *RS* system, the

6  Registration Statement explained that PacBio had "instituted a limited production release program pursuant

7  to which [it] ha[d] received orders for eleven limited production release instruments," that its "limited

8  production release customers include[d] genome centers, clinical, government and academic institutions and

9  an agricultural company," that "[a]s of September 15, 2010, [PacBio had] shipped a total of seven PacBio

10  *RS* limited production release instruments, and [] intend[ed] to ship the remaining four [that] year," and that

11  "[g]enerally, each of these customers is obligated to pay us a deposit after accepting a limited production

12  release instrument, and is entitled to receive an upgrade to a commercial release version of the PacBio *RS*, at

13  which time each customer will be obligated to pay the balance of their order and we will then recognize

14  revenue."

15         87.    The discussion of then-present demand for the Company's *RS* system was false and

16  misleading in that it omitted that many potential customers were *then* intentionally holding off on

17  purchasing the *RS* system until they learned how the "limited production release" performed in the field.

18  The Registration Statement also omitted that many of the limited production trial users were discouraged by

19  the high rate of "bugs" in the *RS* system, which made it highly unreliable and the low raw-read accuracy

20  rate, neither of which was disclosed in the Registration Statement. As a result, the Registration Statement

21  concealed what would-be commercial customers were learning about the *RS* system's limitations in terms of

22  reduced accuracy, yield, throughput and reliability, and that as a result these would be customers were

23  deciding against plunking down the $700,000 for the *RS* system. The discussion of then-present demand

24  was also misleading because it failed to disclosed that the trial users had been promised a 50% discount on

25  any eventual purchase, and the huge disincentive on going public with their complaints about the *RS*

26  system's defects the promise of such a discount was providing. Moreover, the discussion of then-present

27  demand was also misleading because it omitted that Gen-Probe's $50 million pre-IPO "investment" was not

28

- 34 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    a "collaboration agreement," but rather an upfront payment for a *RS* system that guaranteed Gen-Probe the

2    50% discounted price.

3           88.    Concerning the "SMRT Sequencing Advantages," the Registration Statement emphasized the

4    "ability to observe single molecules in real time *combined with long readlength* [which] allow[ed]

5    [PacBio's] system to observe structural and cell type variation that present challenges for existing short read

6    technologies." This was false and misleading as it concealed that the long read-lengths would have to be

7    compromised for accuracy.

8    [Emphasis added.]

9           89.    Concerning the "SMRT Sequencing Advantages," the Registration Statement also

10    emphasized that its "SMRT technology enables longer readlengths than most other commercially available

11    sequencing methods," stating that PacBio had *"demonstrated readlengths greater than 1,000 base pairs on*

12    *average with instances of over 10,000 base pairs"* and that defendants "believe[d] that the long readlengths

13    produced by [PacBio's] SMRT technology [would] allow insights [its] biology that [were] not possible with

14    existing technologies." This too was false and misleading as it concealed that the long read-lengths would

15    have to be compromised for accuracy.

16    [Emphasis added.]

17          90.    As another "SMRT Sequencing Advantage," the Registration Statement emphasized that

18    defendants "believe[d] [its] system [was] easy to use and adopt because it [was] compatible with existing lab

19    workflows and informatics infrastructures" and that the "SMRTbell sample preparation protocol [was]

20    designed to be simple and fast." This was false and misleading as it concealed that the system contained

21    many bugs and that as a result, the "limited production users" were reporting to would-be "final production"

22    users that the system was riddled with bugs and very difficult to use, dissuading potential "final production"

23    users from later placing orders.

24          91.    Concerning potential "final production" customers, the Registration Statement stated that

25    defendants "[would] initially sell [PacBio's] products into the rapidly growing DNA sequencing market,

26    addressing many of the limitations in current sequencing technologies and enabling a wide range of

27    experiments and applications," that based on the data then available to them from their own testing of the *RS*

28    system and from "limited production users," *Defendants "believe[d] that the introduction of the PacBio RS*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   *[would] expand the market for genetic analysis tools," stating "[c]ustomers that have placed orders for*

2   *our products include research institutions and commercial companies that plan to use the PacBio RS for*

3   *clinical, basic and agricultural research, drug discovery and development, biosecurity and bio-fuels."*

4   This discussion of the potential "final production" customers, was false and misleading in that it concealed

5   that "limited production users" were then confirming what Defendants' own experience with the *RS* had

6   been, *i.e.* that it had a low accuracy rate and low reliability, such that "limited production users" were

7   warning would-be "final production" users not to invest in the *RS* system.

8   [Emphasis added.]

9       92.   Concerning "Operating Expenses," the Registration Statement stated that Defendants

10   "expect[ed] sales, general and administrative expense to increase as [the Company] incur[red] additional

11   costs related to *commercializing [its] products....,"* and that Defendants "expect[ed] to incur additional

12   costs as [they] hire[d] personnel and enhance[d] [PacBio's] infrastructure *to support the anticipated growth*

13   *of [its] business."* These statements concerning commercialization and anticipated sales growth were false

14   and misleading based on what Defendants then knew about the lack of acceptance of the *RS* in the market

15   based on the feedback they had then received from the "limited production" users and based on what

16   Defendants themselves knew about the *RS* system's limitations.

17   [Emphasis added.]

18       93.   Expressly referencing the *RS* system's "accuracy," the Registration Statement explained that

19   the then-current "sequencing process" "consist[ed] of three phases comprising sample preparation, physical

20   sequencing and re-assembly," and that the "[i]n the re-assembly phase, bioinformatics software is used to

21   align overlapping reads, which allows the original genome to be assembled into contiguous sequence."

22   Describing the *RS* system, the Registration Statement expressly stated that the "longer the readlength the

23   easier it is to reassemble the genome," and that "[t]he ability to use sequence-based information is

24   contingent not only on assembly, *but the accuracy of the assembled sequence,"* stating there were "two

25   principal forms of accuracy that [were] commonly cited, *referred to as raw read accuracy and finished or*

26   *consensus accuracy,"* emphasizing that the "former [could] be a platform specific performance metric while

27   *consensus accuracy [was] critical to successful reassembly."* Elsewhere, the Registration Statement

28   provided that *the RS system "achieves consensus accuracy of 99.99%* which is commensurate with leading

- 36 -

1  second generation sequencing systems," and that *the "PacBio RS has the capability for circular consensus*

2  *sequencing" that would "achieve 99.99% accuracy at single molecule resolution from a single DNA*

3  *strand."*    Still elsewhere, the Registration Statement explained that "SMRT technology harnesses the

4  natural process of DNA replication, which in nature *is a highly efficient and accurate process*." These

5  express statements of the *RS* system's accuracy were materially false and misleading as they concealed that

6  the system's raw-read accuracy was important and that defendants then knew the *RS* system was only

7  capable of 80%-84% raw-read accuracy, at best and that if customers needed increased raw-read accuracy,

8  they would need to compromise the length of the read rates.

9  [Emphasis added.]

10      94.    Comparing the *RS* system capabilities to those of its competitors, the Registration Statement

11  characterized the *RS* system as "Third Generation" technology that "enables single molecule, real-time, or

12  SMRT, detection of biological processes ... *that addresses many of the limitations of the first and second*

13  *generation technologies, including short readlengths*, limited flexibility, long time to result, *lower*

14  *throughput*, complex sample preparation and risk of amplification bias," that materially overstated the *RS*

15  systems' utility as it concealed the *RS* system's low accuracy rate, the fact that end-users would have to

16  sacrifice long read lengths to achieve optimal accuracy, and that the system's bugs caused it to be highly

17  unreliable. *Because of these known defects, potential final end-users would not pay the relatively higher*

18  *$700,000 price for the RS system and the RS system would never reach commercial viability.*

19  [Emphasis added.]

20      95.    In general, the statements made in the Company's Registration Statement were materially

21  false and misleading when made because the Company failed to the disclose the following material facts

22  concerning PacBio's business operations and their expectations of the commercial viability of the *RS* system

23  based on facts then present and known by Defendants: (1) the Registration Statement materially overstated

24  the status of the *RS* system's development at the time of the IPO; (2) the Registration Statement omitted

25  material facts concerning the *RS* system's relatively low raw-read rate accuracy, low throughput, low yields

26  and that the relatively low raw-read rate, throughput and yield would be significant to would-be commercial

27  purchasers; (3) the Registration Statement omitted discussion of the serious "bugs" in the *RS* system

28  Defendants then knew about based on PacBio's own trials and the feedback PacBio had thus far received

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1  from limited production use customers; (4) the Registration Statement omitted that would-be commercial

2  purchasers would have to compromise read-rate length for raw-read accuracy; (5) the Registration Statement

3  omitted discussion of the negative feedback limited production users were then providing to would-be

4  commercial purchasers and that as such, many were unwilling to pay the relatively higher $700,000 for the

5  *RS* system, as compared to the lower priced systems then available from better-funded competitors; (6) that

6  the limited production trial users had all been promised a 50% discount on any actual purchase price,

7  providing them with significant disincentive to go public with their complaints about the *RS* system until

8  their final sales transactions were complete; (7) that Gen-Probe's pre-IPO $50 million "investment" was in

9  reality a down payment for a system that would allow Gen-Probe to obtain the 50% discount; and (8) as a

10  result of the foregoing, the Registration Statement was false and misleading at all relevant times.

11  **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

12  96.    Plaintiff brings this action as a class action on behalf of a Class, consisting of all those who

13  purchased PacBio's common stock pursuant or traceable to the Company's Registration Statement and who

14  were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of

15  the Company, at all relevant times, members of their immediate families and their legal representatives,

16  heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17  97.    The members of the Class are so numerous that joinder of all members is impracticable.

18  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

19  through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

20  The proposed Class may be identified from records maintained by PacBio or its transfer agent and may be

21  notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

22  securities class actions.

23  98.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the

24  Class are similarly affected by Defendants' wrongful conduct.

25  99.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has

26  retained counsel competent and experienced in class and securities litigation.

27

28

- 38 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

100.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.    whether the Registration Statement contained false and misleading statements; and

     c.    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

101.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

102.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.   This Claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against each of the Defendants.

104.   The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, and omitted facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.

105.   Defendant PacBio is the issuer of the securities purchased by Plaintiff and the Class.  As such, PacBio is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

106.   The Individual Defendants each signed the Registration Statement either personally or through an attorney-in-fact and/or caused their issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in

- 39 -

1   the Registration Statement. They had a duty to ensure that they were true and accurate, that there were no

2   omissions of material facts that would make the Registration Statement misleading and that the document

3   contained all facts required to be stated therein. In the exercise of reasonable care, the Individual

4   Defendants should have known of the material misstatements and omissions contained in the Registration

5   Statement and also should have known of the omissions of material fact necessary to make the statements

6   made therein not misleading. As such, the Individual Defendants are liable to Plaintiff and the Class.

7        107.   The Underwriter Defendants each served as underwriters in connection with IPO. These

8   defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy

9   of the statements contained in the Registration Statement. They had a duty to ensure that they were true and

10   accurate, that there were no omissions of material facts that would make the Registration Statement

11   misleading and that the documents contained all facts required to be stated therein. In the exercise of

12   reasonable care, the Underwriter Defendants should have known of the material misstatements and

13   omissions contained in the Registration Statement and also should have known of the omissions of material

14   facts necessary to make the statements made therein not misleading. As such, the Underwriter Defendants

15   are liable to Plaintiff and the Class.

16        108.   By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

17        109.   Plaintiff acquired PacBio common units in reliance on the Registration Statement and without

18   knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages and the price of

19   PacBio shares declined substantially due to material misstatements in the Registration Statement.

20        110.   This action was brought within one year after the discovery of the untrue statements and

21   omissions and within three years of the date of the IPO.

22        111.   By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to

23   damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of

24   them, jointly and severally.

25                            **SECOND CLAIM**

                    **Violation of Section 12(a)(2) of**

26   **The Securities Act Against PacBio, Martin, Barnes, Dow and the Underwriter Defendants**

27        112.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

28   herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1    113.    Defendants PacBio, Martin, Barnes and the Underwriter Defendants were sellers and offerors

2    and/or solicitors of purchasers of the PacBio securities offered pursuant to the IPO.  Defendants PacBio,

3    Martin, Barnes and the Underwriter Defendants issued, caused to be issued, and signed the Registration

4    Statement in connection with the IPO. The Registration Statement was used to induce investors, such as

5    Plaintiff and the other members of the Class, to purchase PacBio securities.

6    114.    The Registration Statement contained untrue statements of material facts, omitted to state

7    other facts necessary to make the statements made not misleading, and omitted material facts required to be

8    stated therein.  Defendants PacBio's, Martin's, Barnes' and the Underwriter Defendants' actions of

9    solicitation included participating in the preparation of the false and misleading Registration Statement.

10    115.    As set forth more specifically above, the Registration Statement contained untrue statements

11    of material fact and omitted to state material facts necessary in order to make the statements, in light of

12    circumstances in which they were made, not misleading.

13    116.    Plaintiff and the other Class members did not know, nor could they have known, of the

14    untruths or omissions contained in the Registration Statement.

15    117.    Defendants PacBio, Martin, Barnes and the Underwriter Defendants were obligated to make a

16    reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that

17    such statements were true and that there was no omission of material fact required to be stated in order to

18    make the statements contained therein not misleading.  None of the Defendants made a reasonable

19    investigation or possessed reasonable grounds for the belief that the statements contained in the Registration

20    Statement were accurate and complete in all material respects.  Had they done so, these Defendants could

21    have known of the material misstatements and omissions alleged herein.

22    118.    This claim was brought within one year after discovery of the untrue statements and

23    omissions in the Registration Statement and within three years after PacBio securities were sold to the Class

24    in connection with the IPO.

25                                    **THIRD CLAIM**
                        **For Violation of Section 15 of the Securities Act**
26                            **Against the Individual Defendants**

27    119.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth

28    herein.

- 41 -

120.     The Individual Defendants acted as controlling persons of PacBio within the meaning of §15 of the Securities Act. By reason of their ownership, senior management positions and/or directorships at the Company, as alleged above, these Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause PacBio to engage in the conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

121.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's securities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant and certifying Plaintiff as a Class representative;

B.     Awarding Plaintiff and other members of the Class compensatory damages;

C.     Awarding Plaintiff and other members of the Class rescission on their Section 12(a)(2) claims;

D.     Awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.     Awarding Plaintiff and other members of the Class any other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 21, 2011                    SCOTT+SCOTT LLP
                                            MARY K. BLASY



                                            MARY K. BLASY
                                            707 Broadway, Tenth Floor
                                            San Diego, CA  92101
                                            Telephone:  619/233-4565
                                            619/233-0508 (fax)

- 42 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SCOTT+SCOTT LLP
DAVID R. SCOTT
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

Amber L. Eck
ZELDES & HAEGGQUIST, LLP
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: 619/434-0024
619/342-7878 (fax)

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

EXHIBIT   B

**POS-015**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** (Name, State Bar number, and address):<br>Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>TELEPHONE NO: 619/ 233-4565    FAX NO. (Optional): 619/ 233-0508<br>E-MAIL ADDRESS (Optional): mblasy@scott-scott.com<br>ATTORNEY FOR (Name): Plaintiff Greg Young | **FOR COURT USE ONLY** |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Mateo<br>STREET ADDRESS: 400 County Center<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Redwood City, CA 94063<br>BRANCH NAME: |

| | |
|---|---|
| **PLAINTIFF/PETITIONER:** Greg Young<br>**DEFENDANT/RESPONDENT:** Pacific Biosciences of California, et al. | |
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | **CASE NUMBER:**<br>CIV 509210 |

TO (insert name of party being served): <u>Pacific Biosciences of California, Inc.</u>

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: October 28, 2011

Mary K. Blasy
_____    ▶ _____
(TYPE OR PRINT NAME)                       (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other (specify):
       Civil cover sheet, complex case designation, notice of CMC, ADR and court information

**(To be completed by recipient):**

Date this form is signed: 11-17-11

Catherine Moreno
_____    ▶ _____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,        (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                  ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Page 1 of 1<br>Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |

EXHIBIT  C

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262) Scott+Scott LLP 707 Broadway, Suite 1000 San Diego, CA 92101 TELEPHONE NO.: 619/ 233-4565     FAX NO. (Optional): 619/ 233-0508 E-MAIL ADDRESS (Optional): mblasy@scott-scott.com ATTORNEY FOR (Name): Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: CIV 509210 |
|---|---|

TO (insert name of party being served): Hugh C. Martin

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)                      ▶                     (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):
1. ☑ A copy of the summons and of the complaint.
2. ☑ Other (specify):
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

(To be completed by recipient):

Date this form is signed: 11-7-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _Catherine Moreno_ /3C
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

EXHIBIT  D

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>TELEPHONE NO.: 619/ 233-4565    FAX NO. (Optional): 619/ 233-0508<br>E-MAIL ADDRESS (Optional): mblasy@scott-scott.com<br>ATTORNEY FOR (Name): Plaintiff Greg Young | FOR COURT USE ONLY |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo<br>STREET ADDRESS: 400 County Center<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Redwood City, CA 94063<br>BRANCH NAME: |

| |
|---|
| PLAINTIFF/PETITIONER: Greg Young |
| DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al. |

| | |
|---|---|
| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |

TO (insert name of party being served): Susan K. Barnes

<table>
<tr><td align="center"><strong>NOTICE</strong></td></tr>
<tr><td>The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.<br><br>If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.</td></tr>
</table>

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):
1. ☑ A copy of the summons and of the complaint.
2. ☑ Other (specify):
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

(To be completed by recipient):

Date this form is signed: 11-17-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |

EXHIBIT  E

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br><br>TELEPHONE NO.: 619/ 233-4565    FAX NO. *(Optional):* 619/ 233-0508<br>E-MAIL ADDRESS *(Optional):* mblasy@scott-scott.com<br>ATTORNEY FOR *(Name):* Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO *(insert name of party being served):* Brian B. Dow

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)    ▶    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other *(specify):*
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

*(To be completed by recipient):*

Date this form is signed: 11-17-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)    ▶    (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |
|---|---|---|

EXHIBIT  F

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>TELEPHONE NO.: 619/ 233-4565    FAX NO. *(Optional)*: 619/ 233-0508<br>E-MAIL ADDRESS *(Optional)*: mblasy@scott-scott.com<br>ATTORNEY FOR *(Name)*: Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO *(insert name of party being served)*: **Brook Byers**

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: October 28, 2011

Mary K. Blasy
(TYPE OR PRINT NAME)                                    ▶ _____
                                                       (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [✓] A copy of the summons and of the complaint.
2. [✓] Other *(specify)*:
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

*(To be completed by recipient)*:

Date this form is signed: 11-17-11

Catherine Moreno
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)                  ▶ Cathien Moreno /BC
                                                       (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
                                                       ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

---

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

EXHIBIT  G

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>TELEPHONE NO.: 619/ 233-4565    FAX NO. *(Optional):* 619/ 233-0508<br>E-MAIL ADDRESS *(Optional):* mblasy@scott-scott.com<br>ATTORNEY FOR *(Name):* Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO *(Insert name of party being served):* William W. Ericson

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other *(specify):*
    Civil cover sheet, complex case designation, notice of CMC, ADR and court information

*(To be completed by recipient):*

Date this form is signed: 11-17-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

EXHIBIT  H

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>TELEPHONE NO.: 619/ 233-4565    FAX NO. (Optional): 619/ 233-0508<br>E-MAIL ADDRESS (Optional): mblasy@scott-scott.com<br>ATTORNEY FOR (Name): Plaintiff Greg Young | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO (insert name of party being served): Michael W. Hunkapiller

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other (specify):
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

(To be completed by recipient):

Date this form is signed: 11-17-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____ \BC
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

# EXHIBIT  I

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br><br>TELEPHONE NO.: 619/ 233-4565    FAX NO. (Optional): 619/ 233-0508<br>E-MAIL ADDRESS (Optional): mblasy@scott-scott.com<br>ATTORNEY FOR (Name): Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO (insert name of party being served): Randall S. Livingston

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):
1. [✓] A copy of the summons and of the complaint.
2. [✓] Other (specify):
   Civil cover sheet, complex case designation, notice of CMC, ADR and court information

(To be completed by recipient):

Date this form is signed: 11-7-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

EXHIBIT  J

POS-015

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br>    TELEPHONE NO.: 619/ 233-4565    FAX NO. (Optional): 619/ 233-0508<br>E-MAIL ADDRESS (Optional): mblasy@scott-scott.com<br>    ATTORNEY FOR (Name): Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO (insert name of party being served): Susan Siegel

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
    (TYPE OR PRINT NAME)                 ▶    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):
1. ☑ A copy of the summons and of the complaint.
2. ☑ Other (specify):
    Civil cover sheet, complex case designation, notice of CMC, ADR and court information

(To be completed by recipient):

Date this form is signed: 11-17

Catherine Moreno
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ Catherine Moreno \BL
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

EXHIBIT  K

**POS-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mary K. Blasy (211262)<br>Scott+Scott LLP<br>707 Broadway, Suite 1000<br>San Diego, CA 92101<br><br>TELEPHONE NO.: 619/ 233-4565    FAX NO. *(Optional):* 619/ 233-0508<br>E-MAIL ADDRESS *(Optional):* mblasy@scott-scott.com<br>ATTORNEY FOR *(Name):* Plaintiff Greg Young | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME:

PLAINTIFF/PETITIONER: Greg Young

DEFENDANT/RESPONDENT: Pacific Biosciences of California, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>CIV 509210 |
|---|---|

TO *(insert name of party being served):* David B. Singer

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: October 28, 2011

Mary K. Blasy
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing):*
1. [✓]  A copy of the summons and of the complaint.
2. [✓]  Other *(specify):*
     Civil cover sheet, complex case designation, notice of CMC, ADR and court information

*(To be completed by recipient):*

Date this form is signed: 11-17-11

Catherine Moreno
_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Page 1 of 1
Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov